JOSEPH TAYLOR

     *Plaintiff*,

  v.

WEXFORD HEALTH SOURCES, INCORPORATED,
WILLIAM K. MARSHALL III, in his official capacity as
Commissioner of the West Virginia Division of
Corrections and Rehabilitation, and WEST VIRGINIA
DIVISION OF CORRECTIONS AND
REHABILITATION,

     *Defendants*.

Civil Action No. _2:23-cv-00475_

**COMPLAINT**

**JURY TRIAL DEMANDED**

### PRELIMINARY STATEMENT

1.    Plaintiff Joseph Taylor faces imminent detention. He will be sentenced by a West Virginia state court judge on July 10, 2023.

2.    If sentenced to incarceration, Mr. Taylor will be sent to a regional jail and then likely transferred to a state prison.

3.    Mr. Taylor has struggled with opioid addiction for nearly half his life. He is diagnosed with Opioid Use Disorder ("OUD") and is successfully treating this chronic brain disease with Medications for Opioid Use Disorder ("MOUD").

4.    In Clendenin, where Mr. Taylor resides, Mr. Taylor's OUD is treated with suboxone, a version of MOUD, under the supervision of medical staff at the Cabin Creek Health Center.

5.    Upon being incarcerated, Mr. Taylor will be forced off his suboxone and consequently will suffer MOUD withdrawal. That is because within the West Virginia Division of Corrections and Rehabilitation ("WVDCR"), the Defendants deny incarcerated individuals

immediate access to MOUD, even those individuals who enter a WVDCR jail or prison with an active MOUD prescription.

6.     Forced withdrawal from MOUD for individuals like Mr. Taylor is being done at the direction of Defendant Wexford, the for-profit medical provider for all regional jails and state prisons in West Virginia, and Defendant William K. Marshall III, in his official capacity as the Commissioner of the WVDCR, which is the state agency responsible for all regional jails and state prisons in West Virginia.

7.     Mr. Taylor was previously a victim of this policy when he was detained at the Central Regional Jail from January 2023 through mid-March 2023. Upon his arrival at the Central Regional Jail earlier this year, the Defendants refused to provide Mr. Taylor his doctor prescribed MOUD despite his many requests for his medicine.

8.     The Defendants' denial of his MOUD caused Mr. Taylor to suffer weeks of intense physical and mental pain and the return of his dreaded opioid cravings.  He relapsed immediately upon release from detention.

9.     Without immediate judicial intervention, Mr. Taylor will again suffer the agonizing symptoms of withdrawal and face a substantial risk of harm from relapse, including an elevated risk of overdosing and death. He accordingly brings this action under the Americans with Disabilities Act, the Rehabilitation Act, and the Eighth and Fourteenth Amendments to the United States Constitution. He seeks declaratory and injunctive relief requiring the Defendants, Wexford and the WVDCR, to provide him continued access to MOUD while detained in jail and prison under their medical care, as well as damages for the pain and suffering they inflicted on him earlier this year.

**OVERVIEW**

10.     The opioid crisis continues to devastate communities across the country. West Virginia is the epicenter of this nearly three decades long epidemic, consistently ranking as the number one state for overdose deaths per capita in the country.

11.     OUD is a chronic brain disease that rewires the brain for addiction, resulting in uncontrollable cravings for and use of opioids, no matter the negative consequences. People with OUD frequently overdose and die from this illness.

12.     The science is clear: the only effective medical treatment for this brain disorder is MOUD.

13.     According to the American Medical Association, MOUD is "the standard of care for patients in jail and prison settings."[1] MOUD is necessary to treat OUD and there is no justification, absent negative side effects or a patient's wishes, to deny this medicine to people who would benefit, especially those already in treatment.

14.     OUD is a common pathway to jail and prison. Between 1980 and 2019, the number of people incarcerated for drug offenses increased more than ten times, from 40,900 to 430,926.[2] About 65% of the prison population in the United States have an active substance use disorder and another 20% were under the influence of drugs or alcohol at the time of their crime.[3]

---

[1] *AMA Calls for Access to Substance Use Disorder Treatment in Prisons, Jails* (2021), Am. Med. Ass'n, https://www.ama-assn.org/press-center/press-releases/ama-calls-access-substance-use-disorder-treatment-prisons-jails (last visited July 1, 2023).
[2] The Sent'g Project, *Trends in US. Corrections* 3 (2021), https://www.sentencingproject.org/app/uploads/2022/08/Trends-in-US-Corrections.pdf (last visited July 1, 2023).
[3] Nat'l Inst. On Drug Abuse, *Criminal Justice DrugFacts* (2020), https://nida.nih.gov/sites/default/files/drugfacts-criminal-justice.pdf (last visited July 1, 2023).

15.    Despite the scientific consensus that MOUD is essential to treat OUD, decades of entrenched stigma and cost concerns continue to serve as systemic barriers to this life-saving treatment.

16.    Trafficking in this stigma, and financially benefitting by not providing this medical care, the Defendants regularly force incarcerated people in West Virginia with OUD, including those already being treated with MOUD, into a painful and medically dangerous detoxification program and regularly deny this essential medicine to those who would benefit.

17.    Without intervention by this Court, the Defendants will, as they did before this year, force Mr. Taylor off his doctor prescribed MOUD, suboxone. This action will be done despite the express, considered judgement of his treating physicians to the contrary.

18.    Forced withdrawal from suboxone will once again cause Mr. Taylor excruciating mental and physical pain and suffering; dramatically elevate his risk of relapse, overdose, and death; and disrupt the significant progress he has made recovering from an opioid addiction that has consumed nearly half his life.

19.    Forced withdrawal from MOUD is, in Mr. Taylor's own words, "unbearable" and "the worst time[] of my life."[4] As he awaits sentencing, Mr. Taylor constantly fears that if the Defendants again deny him MOUD, he will relapse and die: "Suboxone has saved my life. Without Suboxone, I would be dead from a heroin overdose. This medicine is keeping me alive. I need it."[5]

## PARTIES

20.    Plaintiff Joseph Taylor is a 30-year-old man who was born in and resides in Clendenin, Kanawha County, West Virginia.

---

[4] Decl. of Joseph Taylor ("Taylor Decl.") ¶¶27, 31.
[5] Taylor Decl. ¶33.

21.     He is diagnosed with OUD and is currently being treated with doctor prescribed MOUD. Pursuant to his signed plea agreement in Case No. 23-F-1 in the Circuit Court of Roane County, West Virginia, he faces imminent detention on July 10, 2023.

22.     Defendant Wexford Health Sources, Inc. ("Wexford"), is a for-profit corporation, headquartered in the Commonwealth of Pennsylvania and transacting business throughout the State of West Virginia. Since May 2022, Wexford has been the sole medical provider in all West Virginia regional jails and state prisons, including the Central Regional Jail and Correctional Facility.  At all relevant times, Wexford and its agents were and are acting under color of state law.

23.     Defendant William K. Marshall, III, is the Commissioner of the WVDCR which is responsible for all regional jails and state prisons in West Virginia, including the Central Regional Jail and Correctional Facility. Commissioner Marshall is named solely in his official capacity and for the purposes of seeking declaratory and injunctive relief.

24.     Defendant West Virginia Division of Corrections and Rehabilitation is an entity of the State of West Virginia. WVDCR operates the Central Regional Jail and Correctional Facility and had custody of Joseph Taylor at all times relevant to his claims for damages.

### JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. § 1983; Titles II and III of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.; and the Rehabilitation Act, 29 U.S.C. § 701 et seq.

26.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b). On information and belief, all Defendants are residents of this judicial district and a substantial portion of the events giving rise to the claims asserted herein occurred within this district.

# FACTUAL ALLEGATIONS

**A.**     **Plaintiff Joseph Taylor is diagnosed with Opioid Use Disorder and prescribed suboxone, which is medically necessary to prevent relapse and overdose.**

27.     Mr. Taylor lives in Clendenin, West Virginia. Clendenin is in Kanawha County, the current epicenter of the state's opioid crisis. In 2021, Kanawha ranked number one in West Virginia for overdose fatalities among the state's 55 counties.[6]

28.     As a teenager, Mr. Taylor's life revolved around playing and listening to music, especially Johnny Cash and Hank Williams, riding four-wheelers with his friends, and spending time with his family, especially his younger sister Kathy.

29.     When he was fifteen, Mr. Taylor was in a bad car accident. On impact, the car's airbags inflated to prevent him from going through the windshield. The airbag caused both of his thumbs to bend fully backwards. This injury resulted in immense pain and required surgery. At the time of the accident, Mr. Taylor had never used illegal drugs before.

30.     Because his pain after surgery was so intense, his surgeon ordered a two-month prescription for 10mg of Percocet daily.

31.     These pills immediately relieved his pain. Toward the end of the prescription, the Percocet lost some of its analgesic effect, however, and no longer provided adequate pain relief.

---

[6] *Kanawha County At-A-Glance 2022,* W. Va. Off. of Drug Control Pol'y (2023), https://dhhr.wv.gov/office-of-drug-control-policy/news/Documents/2023%20County%20Snapshots%20and%20WV%20at%20a%20Glance/ODCP%20Kanawha%20County%202022.pdf (last visited Jun 27, 2023). West Virginia is the epicenter of the nation's opioid crisis and consistently ranks number one for state overdose mortality rates in the country. In 2021, there were 90.1 overdose deaths per 100,000 people in West Virginia. By comparison, Tennessee, which had the second-highest overdose death rate in 2021, had 56.6 overdose deaths per 100,000 people. *Drug Overdose Mortality by State*, Ctrs. for Disease Control & Prevention (2022), https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm (last visited July 1, 2023).

32.     Mr. Taylor went back to the surgeon who said something to the effect of "I don't normally give much more for pain, but I'll give you a little something," and then prescribed Roxicodone.[7] The "little something" was much stronger than the Percocet, and ultimately changed Mr. Taylor's life for the worse.

33.     After finishing his Roxicodone prescription, Mr. Taylor was not able to get a refill. He did not feel normal without the pills. He was despondent and started buying Roxicodone pills from acquaintances. It was easy to find prescription pain pills then. His hometown, Clendenin, was flooded with them.

34.     By the time he was sixteen years old, Mr. Taylor was taking three to four Roxicodone pills a day. A year later, he needed up to ten pills daily just to avoid intense withdrawal symptoms. Finding a steady supply of so many pills became costly and difficult.

35.     Soon after he turned seventeen, Mr. Taylor started using heroin. It was cheaper, easier to find, and more powerful. He has been addicted since. No matter how badly he wanted to stop using opioids, he could not. The cravings overwhelmed him.

36.     Within the past few years, Mr. Taylor decided he needed help. He was diagnosed with OUD and prescribed suboxone, a version of buprenorphine.

37.     Suboxone greatly reduces Mr. Taylor's opioid cravings and allows him to live a meaningful and rewarding life.

38.     The World Health Organization designated both buprenorphine and methadone, the two most effective versions of MOUD, as an "essential medicine."[8]

---

[7] Taylor Decl. ¶ 7.

[8] *Opioid Agonist Pharmacotherapy Used for the Treatment of Opioid Dependence (Maintenance)*, World Health Organization, https://www.who.int/data/gho/indicator-metadata-registry/imr-details/2718 (last visited July 1, 2023).

39.     OUD is a relapsing disease. Like many people with OUD, Mr. Taylor's struggle with opioid addiction has been marked by a series of setbacks. The charges for which he will be sentenced for this month are one felony count of possession of a stolen vehicle and one misdemeanor count of fleeing in a vehicle, both of which occurred during an unwanted interruption in his MOUD treatment. These relapses do not mean that MOUD is no longer medically required, but rather suggest the urgent need for treatment.[9]

40.     Since his arrest, Mr. Taylor has made significant progress in his recovery. He got married and works in a local restaurant. He and his wife are raising three sons together. He is proud of his family and his difficult struggle to get his life back on track—and none of that would have been possible without suboxone.

**B.      The Defendants already forced Mr. Taylor into a painful and dangerous withdrawal that resulted in him relapsing and nearly overdosing upon his release from the Central Regional Jail.**

41.     Mr. Taylor was incarcerated at the Central Regional Jail and Correctional Facility in West Virginia from January 2023 through mid-March 2023 as a pretrial detainee. Prior to his incarceration, Mr. Taylor had been receiving suboxone from the Cabin Creek Health Center in Clendenin since April 2022.

42.     When he arrived at the Central Regional Jail, Mr. Taylor told medical and security staff that he was addicted to heroin, was receiving prescription suboxone from the Cabin Creek Health Center, and would continue to suffer a painful withdrawal if not given his medicine.[10]

---

[9] Dr. Barbara Michael Declaration ("Dr. Michael Decl.") ¶31 ("Though Mr. Taylor suffered a few relapses while on suboxone, these occurred during periods of increased stress, including related to his upcoming incarceration, and is consistent with the OUD recovery process. In no way do these relapses suggest that Mr. Taylor no longer needs suboxone. This medicine helps keep him alive.").

[10] Starting in April 2022, Cabin Creek Health Center gave Mr. Taylor a weekly 7-day suboxone supply. He picked up his suboxone prescription on December 20, 2022, but was unable to do so on December 29, 2022. Mr. Taylor was detained at the Central Regional Jail on January 1, 2023.

43.     During intake, jail medical staff noted that Mr. Taylor was experiencing "Withdrawal" from "Suboxone" and that his pharmacy was "Cabin Creek Health Center, Clendenin." Suboxone, like other forms of buprenorphine, is effective at addressing withdrawal symptoms. This is from Wexford's intake form:



44.     No one at the Central Regional Jail called his medical provider at Cabin Creek to confirm his suboxone prescription during his two-month detention, causing him to suffer intense withdrawal symptoms the entire time he was there.[11] Medical staff did, however, confirm other prescriptions for Mr. Taylor at Cabin Creek Health Center and provided these medicines to him.

45.     During his eight plus weeks of incarceration, Mr. Taylor "kept telling medical and security staff that I am addicted to opioids, that Suboxone stops my opioid cravings, that I feared I would use illegal opioids if I did not receive my doctor prescribed Suboxone, and that I was being forced to go through an extremely painful withdrawal." Taylor Decl. ¶22. His repeated suboxone requests were denied. No medical reason was given.

46.     Suboxone has a longer half-life than heroin. This means its withdrawal is longer and more intense. Symptoms include extreme aches, sweats, restlessness, insomnia, shaking, constant diarrhea, an inability to eat, nightmares, hallucinations, and the return of intense opioid cravings that become stronger the longer one is without this medication.

---

[11] Dr. Michael Decl. ¶35 ("I was never contacted about him when he was at the Central Regional Jail. I have never been contacted by Wexford for any patient who was receiving MOUD prior to incarceration in West Virginia.").

47.     Mr. Taylor experienced withdrawal symptoms from the first day he was incarcerated, including heart palpitations, muscle spasms throughout his whole body, severe pain in his neck and upper body, tremors, anxiety, constant diarrhea, shakes, insomnia, and hallucinations.

48.     Worst of all, his dreaded opioid cravings returned. He laid awake at night thinking of heroin. He "could taste it in [his] mouth."[12]

49.     Mr. Taylor asked for his suboxone during intake and again multiple times during the first few weeks he was experiencing withdrawal. Despite his repeated requests, he was not given suboxone or any other form of MOUD.[13]     Instead, he was given over-the-counter medications for his intense physical and mental pain. This was, according to Mr. Taylor, "as effective as trying to fix a broken arm with a Tylenol."

50.     After a lengthy period of intense withdrawal, a jail doctor finally visited him and said words to the effect of, "I don't care who your doctor was, I'm your doctor now and I'm not giving you suboxone."[14]

51.     Mr. Taylor was devastated. Without any chance of getting the MOUD he desperately needed to relieve his intense withdrawal suffering, he started looking for illicit opioids, the only thing that could provide some measure of pain relief.

52.     He knew a relapse could be deadly because his opioid tolerance was low, making his risk of overdose extremely high.

---

[12] Taylor Decl. ¶ 24.
[13] *Id.* ¶ 23.
[14] *Id.*

53.     Once he was released from the Central Regional Jail, Mr. Taylor immediately relapsed and nearly overdosed. This is a predictable outcome for people with OUD who are denied MOUD during incarceration.[15]

54.     Mr. Taylor was terrified that he would relapse again, overdose, and die, so he went back to the Cabin Creek Health Center, where medical staff appropriately determined that he should resume his suboxone treatment immediately.  He is currently receiving suboxone under the care of medical professionals at Cabin Creek.

**C.     The Defendants forcibly withdraw people from MOUD and do not resume treatment nor provide this treatment to OUD patients who would benefit.**

55.      Without immediate judicial intervention, Mr. Taylor will again be forced off suboxone when he is sentenced and incarcerated. He will again suffer an unnecessary and painful withdrawal, his powerful opioid cravings will again return, and he will again face an elevated risk of relapse and overdose.

56.     Mr. Taylor's abrupt forced withdrawal from suboxone at the Central Regional Jail was not an accident or oversight—it is the Defendants' policy and/or standard practice.

57.     West Virginia regional jails and state prisons forcibly and abruptly withdraw people on MOUD from these lifesaving medications even when patients enter custody with a valid prescription.[16]

58.     The policy of forced detoxification from MOUD specifically targets individuals with OUD. Upon information and belief, Defendants do not have any similar forced detoxification

---

[15] One study found that incarcerated people are up to 129 times more likely to die from an overdose in the first two weeks after release compared to the general population largely because their drug tolerances dropped while they were in jail or prison. *See* Ingrid A. Binswanger, Marc F. Stern, Richard A. Deyo, Patrick J. Heagerty, Allen Cheadle, Joann G. Elmore & Thomas D. Koepsell, *Release From Prison — A High Risk of Death for Former Inmates*, 365 New Eng. J. Med. no. 5 (January 2007), https://doi. org/10.1056/nejmsa064115.

[16] Dr. Barbara Michael Decl., ¶ 7 ("Based on my years practicing medicine in West Virginia, people on methadone or buprenorphine (including suboxone) are forcibly and abruptly withdrawn from these lifesaving treatments upon incarceration in all jails and state prisons in West Virginia unless they are pregnant.").

policies that apply to individuals with mental health disabilities, or physical disabilities such as diabetes or high blood pressure.

59.     After forced detoxification, the Defendants do not resume patients on buprenorphine treatment, nor do they initiate these medications to people in their custody who would benefit even though they know that MOUD is the appropriate treatment for individuals with OUD.[17]

60.     The Defendants' practice is to force people with OUD, including those being successfully treated with buprenorphine (including suboxone) into what Wexford calls a "supervised detoxification program for inmates who are chemically dependent."[18]

61.     This practice is sharply at odds with the established standard of care for people with OUD. According to the Centers for Disease Control and Prevention, for example, "opioid therapy should not be discontinued abruptly" and "[d]etoxification on its own, without medications for opioid use disorder, is not recommended for opioid use disorder because of increased risks for resuming drug use, overdose, and overdose death."[19]

62.     Nevertheless, the Defendants force their OUD patients (other than pregnant people) into a dangerous, cruel, and medically unjustified abrupt forced detoxification, even after acknowledging in their medical services agreement that MOUD "reduces recidivism, illegal drug overdose deaths, and infectious disease transmission" both inside and outside correctional facilities.

---

[17] Dr. Jessica McColley Decl., ¶10 ("For all my patients who were forced off their MOUD when incarcerated in West Virginia, nearly 100% of them were never then provided buprenorphine (including suboxone) or methadone by a jail or state prison even though they had valid prescriptions prior to incarceration.  The jails and state prisons also did not initiate these medicines to incarcerated people who needed or would benefit from them.").
[18] *Behavioral Health Services*, Wexford Health Sources, https://www.wexfordhealth.com/services/behavioral-health-services/ (last visited July 1, 2023).
[19] Deborah Dowell, Kathleen R. Ragan, Christopher M. Jones, Grant T. Baldwin, Roger Chou,. *CDC Clinical Practice Guideline for Prescribing Opioids for Pain — United States, 2022,* MMWR Recomm Rep 2022;71(No. RR-3):1–95 (November 4, 2022)  http://dx.doi.org/10.15585/mmwr.rr7103a1

63.     The Defendants know the benefits of MOUD. According to the contract between Wexford and WVDCR:

> Medication Assisted Treatment (MAT) leads to significant benefits for people who are criminal justice system-involved. Untreated users are *12 times more likely to overdose* in the first two weeks after they are released. Research shows that MAT *reduces recidivism, illegal drug overdose deaths, and infectious disease transmission* not only inside the correctional facility but also in the community upon reentry.

[20]

64.     Phase One of the Defendants' approach to addressing the substance use disorder needs of its patients in West Virginia regional jails and state prisons – "Detoxification" – is not, they admit, even an accepted form of treatment for people with OUD.

65.     In fact, the Defendants concede that "most people in the field agree that detox is not a treatment"[21]:

**MAT PHASE ONE: DETOXIFICATION**

Detoxification (detox) is the *first step in the sobering and recovery process*, one that is *critical in the path to recovery.* Although most people in the field agree that detox is not a





form of treatment, it can have a *strong correlation to positive treatment outcomes.* Wexford Health views medical detox as a *link, or pathway, to engage the patient into other treatment* services and programs.

---

[20] *Baxley* v. *Jividen*, 3:18-cv-01526 (S.D.W. Va. 2020), Exhibit B- Part 1, ECF No. 621-2 at 206 (Wexford's April 2022 contract with the WVDCR in which the company agreed to provide medical care in all jails and state prisons according to the terms of this cited document); *see id.* at 2 (WVDCR "hereby enter[s] into a contract with Wexford Health Sources Inc for Comprehensive Inmate Medical and Mental Health Services as outlined in ARFP 0608 DCR2100000003 on an open-ended and continuous basis for a period of five (5) years").
[21]  *Id*. at 207-208.

66.     Nevertheless, Defendants have chosen to make forced detoxification the "Phase One" of their MAT program. Upon information and belief, the only exception to Phase One's forced detoxification is for pregnant people.

67.     The Defendants have the capacity and ability to provide MOUD within the WVDCR, since they do so for pregnant people. They simply choose not to provide this treatment for nearly all other patients with OUD.

68.     It is only after forced withdrawal—and all the suffering and risk that goes with it—that the Defendants indicate they might consider MOUD treatment. That is too late, and their sadistic delay has no basis in medicine. Moreover, so few individuals are placed on MOUD after this dangerous forced withdrawal period that in practice, the Defendants' purported consideration of MOUD is almost entirely hypothetical.

69.     In the case of Mr. Taylor (and many others like him), the Defendants arbitrarily (and without the exercise of medical judgment) concluded that he was not "a good candidate" for MOUD. They made this decision even though Mr. Taylor arrived at the Central Regional Jail with a valid prescription for suboxone from the Cabin Health Creek Center in Clendenin and was suffering, according to the jail's medical staff, from suboxone withdrawal.

70.     As a result of the Defendants' indifference to his acute medical needs and their cruel and medically unjustified OUD practices and policy, Mr. Taylor suffered weeks of excruciating pain and suffering and the return of intense opioid cravings. He relapsed immediately upon release.

71.     On September 27, 2022, United States District Court Judge Richard Chambers for the Southern District of West Virginia approved a class-action settlement with WVDCR regarding

the WVDCR's deliberate indifference to serious medical needs in West Virginia regional jails.[22]

72.     The settlement order required WVDCR to ensure that people in its correctional facilities who were receiving MOUD pre-incarceration are continued on this treatment once incarcerated, among other requirements.[23]

73.     Upon information and belief, this is not occurring with consistency, if at all. Reports from numerous class members indicate that those incarcerated with current MOUD prescriptions are regularly placed on a detox protocol. Even if they are ultimately approved for MOUD, patients' access to MOUD is substantially delayed and often changed from their previously prescribed MOUD to a different version.

**D.     Opioid Use Disorder is a life-threatening disease that alters the brain's chemistry.**

74.     Opioids are a class of drugs that inhibit pain and cause feelings of pleasure.  Some opioids, such as oxycodone, have accepted medical uses, including managing severe or chronic pain.  Others, such as heroin, are illegal and not used as medicine in the United States. But all opioids are highly addictive.

75.     OUD is a chronic, relapsing brain disorder that can have deadly consequences. Its symptoms include uncontrollable cravings for and compulsive use of opioids, decreased sensitivity to them, and potentially excruciating withdrawal symptoms.

76.     OUD is a progressive brain disease, meaning it often becomes more severe over time.  People who regularly use opioids develop a tolerance to them and need to use increasing amounts to feel the desired effect. At high doses, opioids depress the respiratory system, sometimes

---

[22] The class included "All persons who are, or will be, admitted to a jail in West Virginia." *Id.* at ECF No. 686 at 2, Order Approving Class Action Settlement and Attorney Fees.

[23] *Id.* at ECF No. 653, Joint Motion for Preliminary & Final Approval of Class Action Settlement and Notice to the Class.

causing the user to stop breathing which can result in death.

77.     Without effective treatment, people with OUD are often unable to control their opioid intake, leading to serious physical and emotional harm.

78.     OUD breaks down the dopamine system necessary for the brain to feel a sense of normalcy and perform cognitive functions necessary for survival. Dopamine functions as neurotransmitters and plays a key role in movement, memory, and other body functions.

79.     People who have dopamine problems due to OUD have difficulty enjoying life activities and feeling normal, and experience feelings of depression, anxiety, and irritability.

80.     OUD rewires the brain for addiction. People with OUD cannot simply "will" or "reason" their way out of continued opioid use, even when they are aware of the dire consequences.

81.     Continued use does not indicate a person lacks willpower, but rather is the predictable outcome of chemical changes in the brain that result in uncontrollable opioid cravings.

82.     OUD has thus proven especially unresponsive to non-medication-based treatment methods, such as abstinence-only and twelve-step programs, which have been popular in treating other addictions such as alcoholism.

83.     Like other chronic diseases, OUD often involves cycles of relapse and remission. Rather than a linear progression in which a person attains complete abstinence, "successful" recovery from OUD is often characterized by sustained periods of abstinence or "active recovery," punctuated by relapses in which the person returns to drug use.

84.     These relapses are frequently triggered by an increase in stress, a traumatic event, or a lapse in treatment. The typical treatment goal for OUD is thus to maximize periods of active recovery and minimize periods of relapse. This is done by ensuring continued treatment and encouraging the use of coping mechanisms and support systems.

**E.      MOUD allows millions of Americans who suffer from OUD to live healthy and productive lives.**

85.      MOUD decreases opioid use, reduces the risk of relapse and overdose death, and improves treatment retention.

86.      MOUD also lowers the likelihood of criminal activity, reduces infectious disease transmissions, and improves patients' ability to maintain positive family relationships and employment.

87.      While treatment typically consists of medication combined with counseling and other behavioral therapies, medication is the primary driver of efficacy.

88.      The Food and Drug Administration ("FDA") has approved three medications for treating OUD: methadone, buprenorphine, and naltrexone. These medications are not the same and cannot be used interchangeably for every patient.

89.      Buprenorphine is an "agonist," which means it activates opioid receptors in the brain to relieve withdrawal symptoms and control opioid cravings.

90.      Because buprenorphine binds to the opioid receptors it stimulates, it blocks the receptors from being activated by more powerful opiate agonists. This means that patients cannot get "high" from illicit drugs like heroin and fentanyl while on buprenorphine. This in turn trains a brain rewired by opioid addiction to gradually decrease its response and interest in opioids (a process is known as extinction learning).

91.      Naltrexone, in contrast, is an "antagonist," meaning it blocks opioid receptors without activating them. This prevents the euphoric effect of opioids, thereby reducing desire for them over time.

92.      Unlike buprenorphine, naltrexone does not relieve withdrawal symptoms. In fact, it can trigger acute and severe withdrawal and an elevated risk of relapse.

93.     Studies show that naltrexone treatment produces substantially poorer treatment retention than buprenorphine. Buprenorphine, in contrast, produces longer-term treatment retention, which is the key for recovery. The longer a patient stays in treatment, the less likely they are to relapse.

94.     Treatment with MOUD is necessarily individualized.  A patient may do well on any form of MOUD or find that only one provides effective treatment without causing significant adverse side effects. An MOUD that effectively treats one person may be completely ineffective for another.

95.     There is no maximum recommended duration for MOUD treatment. As the Substance Abuse and Mental Health Services Administration ("SAMHSA") recognized, treatment for OUD — like treatment for other chronic diseases such as insulin for diabetes — is often lengthy and can last for years or even a lifetime.

96.     MOUD does not substitute one drug for another. As SAMHSA makes clear, MOUD are "evidence-based treatment options" that "relieve the withdrawal symptoms and psychological cravings that cause chemical imbalances in the body."[24]

**F.      MOUD is the standard of care for treating OUD.**

97.     The American Medical Association, the American Society of Addiction Medicine, the U.S. Department of Health and Human Services, the FDA, the National Institute on Drug Abuse, the White House Office of National Drug Control Policy, SAMHSA, and the World Health Organization all endorse the critical role of MOUD, specifically methadone and buprenorphine, in addressing opioid addiction.

---

[24] *Medications, Counseling, and Related Conditions* (2021), Substance Abuse & Mental Health Servs. Admin., https://www.samhsa.gov/medication-assisted-treatment/medications- counseling-related-conditions (last visited July 1, 2023).

98. The American Medical Association is clear that MOUD is the well-accepted "standard of care for patients in jail and prison settings"[25] and supports the removal of "administrative burdens or barriers that delay or deny care for FDA-approved medications used as part of medication assisted treatment (MAT) for opioid use disorder (OUD)."[26]

99. Likewise, the Department of Health and Human Services calls for expanded MOUD in the criminal justice and health systems, emphasizing that, "[a]ccess to medications that treat opioid use disorders (known as MOUD) is essential to address the high rates of opioid addiction and overdose mortality."[27] In other words, MOUD treatment is necessary to address the serious risk of harm that patients like Mr. Taylor face from OUD.

100. Both the Biden and Trump administrations have supported expanding MOUD access to address the opioid epidemic and public safety. The first principle of the White House's 2022 National Drug Control Strategy for criminal justice and public safety is ensuring MOUD access in jails and prison, which will "dramatically reduce mortality post-release and increase the likelihood that an individual will stay in treatment, rejoin their communities successfully, and reduce their risk of recidivism—all of which enhance individual and community public health and public safety outcomes."[28]

101. President Trump's 2017 Commission on Combating Drug Addiction and the Opioid Crisis called for expanded MOUD access for people with OUD needs in jails and prisons,

---

[25] *AMA Calls for Access to Substance Use Disorder Treatment in Prisons, Jails* (2021), Am. Med, Ass'n., https://www.ama-assn.org/press-center/press-releases/ama-calls-access-substance-use-disorder-treatment-prisons-jails (last visited July 1, 2023).

[26] *AMA Opioid Task Force Issues New Recommendations*, Am. Med. Ass'n Opioid Task Force, https://end-overdose-epidemic.org/wp-content/uploads/2020/06/2019-AMA-Opioid-Task-Force-Recommendations-FINAL.pdf (last visited July 1, 2023).

[27] Off. of Inspector Gen., *Use of Medications for Opioid Use Disorder (MOUD) in Medicaid* (2021), https://www.oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000700.asp (last visited July 1, 2023).

[28] *Id.*

as the provision of MOUD is "correlated with reduced risk of mortality in the weeks following release" and will "reduce future public safety and public health costs."[29]

102.    Ensuring MOUD access is also a top priority of the Department of Justice ("DOJ"). In the DOJ's 2022-2026 Strategic Plan, the third element of its "Combatting Drug Trafficking" efforts is making sure that incarcerated people receive the MOUD they need and are entitled to under the nation's civil rights laws and constitutional protections.[30]

103.    This focus is not new. The DOJ has determined that MOUD access is required in carceral settings and court programs. The DOJ has confirmed that MOUD is the standard of care for treatment of OUD and that denying incarcerated people access to this treatment violates their civil rights and constitutional protections.

104.    In January 2021, the DOJ's Civil Rights Division, for example, issued a report concluding that the Cumberland County Jail in Bridgeton, New Jersey, violated the Eighth and Fourteenth Amendments by failing to provide MOUD to people in its custody, approximately 25% of whom suffered from OUD.[31]

105.    According to the DOJ Report, "because [MOUD] is the standard of care, categorically denying [MOUD] to inmates with Opioid Use Disorder is a failure to provide adequate medical care for this serious medical condition."[32]

106.    Many other law enforcement and correctional groups have also recognized the importance of ensuring MOUD access in the criminal justice system, including the American

---

[29] *The President's Commission on Combating Drug Addiction and The Opioid Crisis*, White House 72, 73 (2017), https://trumpwhitehouse.archives.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-15-2017.pdf (last visited July 1, 2023).

[30] U.S. Dep't of Just., *FYs 2022-2026 Strategic Plan* 33, https://www.justice.gov/doj/book/file/1516901/download (last visited July 1, 2023).

[31] U.S. Dep't of Just., *Investigation of The Cumberland County Jail* (Jan. 14, 2021), https://www.justice.gov/opa/press-release/file/1354646/download (last visited July 1, 2023).

[32] *Id.* at 6.

Correctional Association, the National Sheriffs' Association, the National Commission on Correctional Health Care ("NCCHC"), and the Bureau of Prisons ("BOP").[33]

107.    The BOP directed all medical staff at its correctional facilities to screen and assess people for OUD "throughout their incarceration" and provide MOUD to those who need it. The BOP notes that provision of MOUD will "reduce drug use, disease rates, and overdose events and increase[] retention in treatment programs while promoting recovery among individuals with OUD."[34]

**G.    Forced withdrawal from MOUD and forced withdrawal from opioids unassisted by MOUD is dangerous and often deadly**.

108.    Forced and abrupt withdrawal (also known as forced detoxification) from opioids and MOUD often triggers painful withdrawal symptoms that markedly increase the risk of relapse, overdose, and death.

109.    Forced detoxification is so traumatic on the body that it can cause pregnant women to miscarry and lead to other life-threatening complications.[35]

110.    Patients forced into detoxification should expect the return of intense opioid cravings that effective MOUD medications neutralize.

111.    The physical and mental symptoms of forced detoxification are often crushing. They include bone and joint aches, nausea, vomiting, diarrhea, fever, excessive sweating, hypothermia, hypertension, tachycardia, depression, anxiety, dysphoria, and insomnia.

---

[33] In 2021, the NCCHC published guidelines calling for "universal OUD screening" and the provision of MOUD to those who need this treatment in jail, prisons, and detention facilities. According to the NCCHC, this will "reduce deaths, improve long-term health outcomes, [and] interrupt the cycle of recidivism." *Opioid Use Disorder Treatment in Correctional Settings (2021)*, Nat'l Comm'n on Corr. Health Care (2021), https://www.ncchc.org/opioid-use-disorder-treatment-in-correctional-settings-2021/ (last visited July 1, 2023).
[34] *Opioid Use Disorder: Diagnosis, Evaluation, and Treatment*, Fed. Bur. of Prisons Clinical Guidance 6 (2021), https://www.bop.gov/resources/pdfs/opioid_use_disorder_cg.pdf (last visited July 1, 2023).
[35] Veronica Spadotto et al., *Heart Failure Due to "Stress Cardiomyopathy": A Severe Manifestation of the Opioid Withdrawal Syndrome*, 2 Acute Cardiovascular Care 84 (2013), https://academic.oup.com/ehjacc/article/2/1/84/5921860?login=true (last visited July 1, 2023).

112. These symptoms can last for weeks or months and lead to life-threatening complications — even apart from the risk of relapse and overdose — including pneumonia and fatal dehydration.

113. Numerous medical and law enforcement organizations warn against forced detoxification without the provision of MOUD and the abrupt cessation of MOUD because doing so elevates the risk of relapse, overdose, and death, and is a barrier to treatment and recovery.

114. The Centers for Disease Control and Prevention, for example, cautions that "opioid therapy should not be discontinued abruptly" and that "[d]etoxification on its own, without medications for opioid use disorder, is not recommended for opioid use disorder because of increased risks for resuming drug use, overdose, and overdose death."[36]

115. When someone with an addiction or dependence on opioids (illicit or prescription) plans to cease use, it is best practice to use MOUD to ease the transition and avoid withdrawal symptoms. When treatment with MOUD must be discontinued, due to a patient's wishes or medical necessity, it is crucial to taper as slowly as possible so to avoid severe withdrawal symptoms. A safe taper can last for months and even years.

**H. Providing MOUD in correctional facilities reduces drug use, saves lives, and lowers criminal recidivism rates.**

116. Numerous studies have shown that MOUD access in correctional facilities reduces opioid use, overdose deaths, and criminal recidivism rates, and increases the likelihood of continued addiction treatment.[37]

---

[36] Centers for Disease Control and Prevention, Opioid Use Disorder: Treatment and Prevention, https://www.cdc.gov/opioids/healthcare-professionals/prescribing/opioid-use-disorder.html (last visited July 1, 2023).

[37] Nat'l Inst. on Drug Abuse, *Effective Treatments for Opioid Addiction*, Policy Brief (2016), *available at* https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction (last visited July 1, 2023).

117.     For example, one study involving Rhode Island's unified jail and prison system, which provides all people with OUD access to MOUD, found that (1) 95% of the individuals in the MOUD program continued drug treatment after release, (2) post-release deaths for participants declined by 60%, and (3) all opioid-related deaths in the state fell by over 12% in just the first year of operation.[38]

118.     Another large study of a different MOUD program within a correctional setting documented an 85% decrease in overdose deaths and a 75% reduction in overall mortality in the first four weeks after release for people who were maintained on MOUD while incarcerated.[39]

119.     Ensuring MOUD access in jails and prisons not only saves lives following release but also the lives of people still incarcerated.[40]

120.     One study showed that the risk of unnatural death, including overdose, suicide, and other preventable causes was about 87% lower for incarcerated people on MOUD compared to those whose OUD needs were ignored.[41] Incarcerated people receiving methadone or buprenorphine were also 94% less likely to die during their first four weeks of incarceration than those not receiving this treatment.[42]

121.     Providing MOUD in jails and prisons also saves taxpayer money by reducing criminal recidivism and incarceration rates.

---

[38] Lauren Brinkley-Rubinstein et al., *The Benefits and Implementation Challenges of the First State-Wide Comprehensive Medication for Addictions Program in a Unified Jail and Prison Setting*, 205 Drug and Alcohol Dependence (Dec. 2019).

[39] John Marsden et al., D*oes Exposure to Opioid Substitution Treatment in Prison Reduce the Risk of Death After Release? A National Prospective Observational Study in England*, Addiction 112, no. 8 (2017): 1408–18, https://pubmed.ncbi.nlm.nih.gov/28160345/ (last visited July 1, 2023).

[40] Margaret E. Noonan, *Mortality in Local Jails, 2000-2014 — Statistical Tables* Bureau of Just. Statistics (December 2016), https://www.bjs.go v/index.cfm?ty=pbdetail&iid=5865 (last visited July 1, 2023).

[41] Sarah Larney et al., *Opioid substitution therapy as a strategy to reduce deaths in prison: retrospective cohort study*, BMJ Open 4, no. 4 (April 2014):1-8, https://bmjopen.bmj.com/content/4/4/e004666 (lasted visited July 1, 2023).

[42] *Id.*

122.    One recent study compared two Massachusetts jails: one that provided buprenorphine and another that did not. The study concluded that "among incarcerated adults with opioid use disorder, risk of recidivism after jail exit is lower among those who were offered buprenorphine during incarceration."[43]

## CLAIMS FOR RELIEF

### First Claim
### Violation of Title II of the Americans with Disabilities Act
### (Defendants Marshall and the WVDCR)

123.    Each of the paragraphs of this Complaint is incorporated as if fully stated herein.

124.    Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

125.    To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

126.    The WVDCR is a public entity as defined in 42 U.S.C. § 12131(1).

---

[43] Elizabeth A. Evans, Donna Wilson & Peter D. Friedmann, *Recidivism and mortality after in-jail buprenorphine treatment for opioid use disorder*, 231 Drug and Alcohol Dependence 109254 (2022), https://pubmed.ncbi.nlm.nih.gov/35063323/ (last visited Jun 21, 2023).

127.     Joey Taylor has a disability within the meaning of the Americans with Disabilities Act. He is otherwise qualified to participate in programs, services, or benefits offered by the WVDCR, including but not limited to access to medical and mental health services.

128.     Despite Mr. Taylor's known disability, the WVDCR failed to reasonably accommodate his disability and discriminated against him, as described above. As a result of the Defendants' conduct, Mr. Taylor has suffered injuries, including pain and suffering.

129.     In addition, upon being incarcerated on July 10, 2023, absent judicial intervention, the WVDCR will again fail to reasonably accommodate his disability and discriminate against him, in violation of the ADA.

130.     Accordingly, the Defendants' conduct as alleged in the Complaint violates Title II of the Americans with Disabilities Act.

### Second Claim
### Violation of Title III of the Americans with Disabilities Act
### (Defendant Wexford)

131.     Each of the paragraphs of this Complaint is incorporated as if fully stated herein.

132.     Title III of the ADA prohibits "discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

133.     Under Title III of the ADA, discrimination includes a "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would

fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations[.]" 42 U.S.C. § 12182(b)(2)(A)(ii).

134.     Wexford, a Pennsylvania company, contracts with the WVDCR and other state agencies across the country to provide medical and mental health services at correctional facilities operated by those state agencies. In conducting its business pursuant to those contracts, Wexford's corporate officers in Pennsylvania regularly communicate and participate in the performance of those contracted services.

135.     Wexford's operations affect commerce, and it offers public accommodations within the meaning of the ADA.

136.     Despite Mr. Taylor's known disability, Wexford failed to reasonably accommodate his disability and discriminated against him, as described above. As a result of the Defendant's conduct, Mr. Taylor has suffered injuries, including pain and suffering.

137.     In addition, upon being incarcerated on July 10, 2023, absent judicial intervention, Wexford will again fail to reasonably accommodate his disability and discriminate against him, in violation of the ADA.

138.     Accordingly, Wexford's conduct as alleged in the Complaint violates Title III of the Americans with Disabilities Act.

### Third Claim
### Violation of the Rehabilitation Act
### (Defendants Marshall and the WVDCR)

139.     Each of the paragraphs of this Complaint is incorporated as if fully stated herein.

140.     Joey Taylor has a disability within the meaning of the Rehabilitation Act. He was and is otherwise qualified to participate in programs, services, or benefits offered by the WVDCR and Wexford, including but not limited to access to medical and mental health services.

141.     Under the Rehabilitation Act, the Defendants are responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

142.     The WVDCR receives federal funding.

143.     Despite Mr. Taylor's known disability, the Defendants failed to reasonably accommodate his disability and discriminated against him, as described above. As a result of the Defendants' conduct, Mr. Taylor has suffered injuries, including pain and suffering.

144.     In addition, upon being incarcerated on July 10, 2023, absent judicial intervention, Defendants will again fail to reasonably accommodate his disability and discriminate against him, in violation of the Rehabilitation Act.

145.     Accordingly, Defendants' conduct as alleged in the Complaint violates the Rehabilitation Act.

### Fourth Claim
### Violation of the Eighth Amendment to the United States Constitution
### (Defendants Marshall and Wexford)

146.     Each of the paragraphs of this Complaint is incorporated as if fully stated herein.

147.     In the manner described more fully above, Defendants are aware that Mr. Taylor faces a substantial risk of serious harm if he is not provided with MOUD upon his incarceration.

148.     Despite that knowledge, absent judicial intervention, Defendants will fail to provide Mr. Taylor with appropriate medical care or access to medical care, in violation of the Eighth Amendment to the United States Constitution.

149.    Defendants' actions occur with deliberate indifference to the rights of those like Mr. Taylor, who require MOUD to address their diagnosed OUD.

150.    Accordingly, the Defendants' conduct as alleged in the Complaint violates the Eighth Amendment to the United States Constitution.

### Fifth Claim
### Violation of the Fourteenth Amendment to the United States Constitution
### (Defendant Wexford)

151.    Each of the paragraphs of this Complaint is incorporated as if fully stated herein.

152.    In the manner described more fully above, Wexford was aware that Mr. Taylor faced a substantial risk of serious harm if he was not provided with MOUD upon his January 2023 incarceration.

153.    Despite that knowledge, Wexford failed to provide Mr. Taylor with appropriate medical care or access to medical care, in violation of the Fourteenth Amendment to the United States Constitution.

154.    Wexford's failure was committed by its employees pursuant to Wexford's policies and practices as described more fully above.

155.    Wexford's conduct was objectively unreasonable and it was deliberately indifferent to Mr. Taylor's objectively serious medical needs.

156.    As a result of Wexford's conduct, Mr. Taylor suffered injuries, including extreme physical and mental distress.

157.    Accordingly, Wexford's conduct as alleged in the Complaint violated the Fourteenth Amendment to the United States Constitution.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

A. Declare that Defendants' conduct as alleged in the Complaint violates Plaintiff's rights under the ADA, the Rehabilitation Act, and the U.S. Constitution;

B. Enjoin Defendants from:

    a. Forcibly withdrawing Joseph Taylor from his suboxone treatment while he is incarcerated in any jail and prison under their care;

    b. Interrupting Joseph Taylor's prescribed suboxone treatment while he is incarcerated in any jail and prison under their care;

C. Issue an order requiring Defendants to continue Joseph Taylor on his suboxone prescription and treatment during his upcoming detention and to create and follow a discharge plan to ensure continuity of treatment upon his release from custody;

D. Award Plaintiff damages and his reasonable attorney's fees and costs; and

E. Grant any further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff Joseph Taylor hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

Respectfully submitted,
JOSEPH TAYLOR,
By Counsel:

/s/ Lydia C. Milnes
Lydia C. Milnes (WVSB #10598)
Lesley M. Nash (WVSB #14158)
Mountain State Justice, Inc.
1029 University Ave., Ste. 101
Morgantown, WV 26505
Phone: (304) 326-0188
Facsimile: (304) 326-0189
lesley@msjlaw.org
lydia@msjlaw.org

Sarah Grady (IL Bar No. 6312933) (Pro Hac Vice Application Forthcoming)
David Howard Sinkman (NY Bar No. 4684981) (Pro Hac Vice Application Forthcoming)
Kaplan & Grady LLC
1953 N. Clybourn Ave., Ste. 274
Chicago, IL 60614
Phone: (312) 852-2184
Facsimile: (312) 626-6715
sarah@kaplangrady.com
sinkman@kaplangrady.com

Amelia Caramadre (MA Bar No. 710230) (Pro Hac Vice Application Forthcoming)
The Action Lab
Center for Health Policy and Law
Northeastern University School of Law
360 Huntington Ave – 120KN
Boston, MA 02115
a.caramadre@northeastern.edu