JOSEPH TAYLOR
    *Plaintiff*,

v.

WEXFORD HEALTH SOURCES, INCORPORATED,
WILLIAM K. MARSHALL III, in his official capacity
as Commissioner of the West Virginia Division of
Corrections and Rehabilitation, and WEST VIRGINIA
DIVISION OF CORRECTIONS AND
REHABILITATION,

    *Defendants*.

Case No. 2:23-cv-00475

## <u>DECLARATION OF BARBARA MICHAEL, M.D.</u>

Pursuant to 28 U.S.C. § 1746, I, Dr. Barbara Michael, declare as follows:

1. I was the lead clinician at the Clendenin Health Center ("CHC"), which is part of the Cabin Creek Health Systems, for the past five years.
2. I stopped working at CHC on June 1, 2023, and am currently the outpatient family physician at Cone Health in Greensboro, North Carolina.
3. I received my medical degree from Marshall University in 2006 and have practiced medicine for the past thirteen years. I am board certified in family medicine.
4. When CHC's Comprehensive Addiction Recovery Program ("CARP"), which is focused on providing treatment for people with substance use disorders, began in 2018, I received medication assisted therapy training from the Society of Addiction Medicine. I also attended addiction medicine conferences and took the SAMHSA X-waiver training to be informed about and able to prescribe Medications for Opioid Use Disorder ("MOUD").
5. Buprenorphine and methadone are the two most effective forms of MOUD. Suboxone is a version of buprenorphine.
6. MOUD treatment is the standard of care for opioid use disorder ("OUD").
7. Based on my years practicing medicine in West Virginia, people on methadone or buprenorphine (including suboxone) are forcibly and

abruptly withdrawn from these lifesaving treatments upon incarceration in all jails and state prisons in West Virginia unless they are pregnant.

8. Over my years treating people with OUD needs in West Virginia, I am aware of only two people who entered a West Virginia jail or state prison with a MOUD prescription and were then allowed to continue their medicine while incarcerated.

9. These two cases occurred only after my dedicated advocacy on the patients' behalf.

10. For these two patients, I prepared medical packages for their lawyers to present to the judge before any sentencing related hearing. I also wrote a letter to the judge explaining the need for continued MOUD treatment and provided a photocopy of the MOUD prescription and all other medicines the patient was taking.

11. MOUD was continued for these two patients only after the judge intervened.

12. Most OUD patients do not have access to a medical provider and lawyer who can offer similar advocacy in time to get a judge involved. This should not be what is necessary for MOUD to be provided in a jail or state prison in West Virginia.

13. I am not aware of any person continued on their MOUD in West Virginia jails or state prisons without this type of doctor and court involvement.

14. I am also not aware of any person who was evaluated for OUD while incarcerated and then provided MOUD in any jail or state prison in West Virginia.

15. Forced and abrupt withdrawal, or detoxification, from MOUD is extremely dangerous, medically inadvisable, and violates the standard of care.

16. People who regularly use opioids develop a tolerance to them and need to use increasing amounts to feel the desired effect. At high doses, opioids depress the respiratory system, causing the user to stop breathing and often die. Without effective medical treatment, patients with OUD are rarely able to control their opioid intake, often resulting in serious physical and emotional harm, including overdose death.

17. OUD rewires the brain. Continued use does not indicate a person lacks willpower, but rather is the result of chemical changes in the brain that produce uncontrollable opioid cravings.

18. Like many other chronic diseases, OUD often involves cycles of relapse and remission. Rather than a linear progression in which a person attains complete abstinence from opioids, "successful" recovery is often characterized by sustained periods of abstinence, known as "active

recovery," punctuated by relapses in which the person has an incident of drug use.

19. These relapses are frequently triggered by an increase in life stressors, a traumatic event, or a lapse in treatment. The typical OUD treatment goal is thus to maximize periods of active recovery and minimize periods of relapse. This is best done by ensuring continued treatment and encouraging the use of coping mechanisms and support systems.

20. I have been treating patients with MOUD, including suboxone, since 2021.

21. During my employment at CHC, I oversaw CARP and served as the program's lead physician in the Clendenin office.

22. I started treating Joseph Taylor at CHC in April 2022.

23. Mr. Taylor is diagnosed with OUD.

24. After considering Mr. Taylor's medical profile, his severe OUD needs, and all available treatment options, I determined, based on my medical expertise and training, that suboxone is the necessary medication for his OUD.

25. Mr. Taylor is currently prescribed 16 mg of suboxone to be taken daily. This is the current maximum dose that can be prescribed without prior authorization.

26. This high dose of suboxone reflects the severity of Mr. Taylor's OUD. This medicine is essential to his health and safety.

27. Mr. Taylor has done well on suboxone. This medicine helps to curb his opioid cravings. This in turn allows him to devote time to his family and work.

28. Though Mr. Taylor suffered a few relapses while on suboxone, these occurred during periods of increased stress, including related to his upcoming incarceration, and is consistent with the OUD recovery process. In no way do these relapses suggest that Mr. Taylor no longer needs suboxone. This medicine helps keep him alive.

29. Involuntarily withdrawing Mr. Taylor from his suboxone treatment is medically contraindicated.

30. Forced withdrawal from suboxone will cause Mr. Taylor to experience severe and extended withdrawal symptoms and the return of powerful opioid cravings.

31. Forced and abrupt withdrawal from MOUD violates the medical standard of care. If someone needs to be withdrawn from MOUD for a medical purpose, this should be done slowly.

32. If Mr. Taylor is not allowed to continue taking suboxone while incarcerated, he will again suffer intense, painful, and life-threatening withdrawal symptoms within about twelve-to-twenty-four hours of any treatment interruption.

33. Discontinuing his suboxone treatment will again place him at grave risk of illness, relapse, and fatal overdose, and will jeopardize his recovery from opioid use in the long term.

34. This happened to Mr. Taylor when he was incarcerated earlier this year and resulted in needless and painful withdrawal symptoms, the return of his drug cravings, and relapse.

35. It is my understanding that Mr. Taylor informed medical staff at the Central Regional Jail when incarcerated there in early 2023 that he had a suboxone prescription and that I was his provider, and that he asked the jail medical staff to reach out to me to confirm the prescription. I was never contacted about him when he was at the Central Regional Jail. I have never been contacted by Wexford for any patient who was receiving MOUD prior to incarceration in West Virginia.

36. Forced withdrawal of Mr. Taylor from his suboxone treatment would be a violation of the medical standard of care. It is necessary for Mr. Taylor's health, safety, and OUD treatment needs that he continue on his daily suboxone treatment without interruption during his upcoming incarceration.

Barbara Michael, M.D.

Dated: June 28, 2023
Greensboro, North Carolina