IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**JOSEPH TAYLOR,**

    **Plaintiff,**

**v.**                                                                      **Civil Action No. 2:23-cv-00475**
                                                                           **Honorable Irene C. Berger**

**WEXFORD      HEALTH      SOURCES,**
**INCORPORATED and WEST VIRGINIA**
**DIVISION  OF  CORRECTIONS  AND**
**REHABILITATION,**

    **Defendants.**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WEXFORD HEALTH**
**SOURCES, INC.'S MOTION FOR SUMMARY JUDGMENT**

      **COMES NOW** this Defendant, Wexford Health Sources, Inc. (hereinafter "Wexford"), by

counsel Jordan K. Herrick, Adam K. Strider, and submits for this Honorable Court's consideration

the following Memorandum of Law in support of its contemporaneously-filed Motion for Summary

Judgment.

**I.      STATEMENT OF FACTS**

      This lawsuit arises out of Plaintiff Joseph Taylor's incarceration at Central Regional Jail

(hereinafter "CRJ") from January 1, 2023, until March 9, 2023. (ECF No. 36, ¶ 3). Defendant

Wexford Health Sources, Inc. (hereinafter "Wexford") contracts with the West Virginia Division of

Corrections and Rehabilitation (hereinafter "WVDCR") to provide medical care at CRJ. Plaintiff

was screened by LPN Leslie Young on January 1, 2023, at 6:52 p.m. *January 1, 2023, Chart Note*,

Ex 1. He tested positive for amphetamine, methamphetamine, and Fentanyl. *Id.* He did not test

positive for buprenorphine, an opioid based Medication for Opioid Use Disorder ("MOUD"). He

self-reported that he was withdrawing from Suboxone, a type of buprenorphine, though this was not

1

reflected on his drug screen. *Id.*

At the time of Plaintiff's incarceration, the only individuals who were prescribed buprenorphine were individuals who had active prescriptions at the time of their arrest or if the onsite provider evaluated them and deemed it necessary. Specifically, the Health Services Administrator, Lara Lynn, testified:

> Q:    Okay. I want to focus just on January 1, 2023 through March 2023, when Mr. Taylor was incarcerated. Is it my understanding that if someone were arrested and brought to your facility -- and I'm just focusing on that time frame. If someone was arrested and brought to your facility and they had an active prescription, they were given the option to continue their MOUD, correct?
>
> A:    Yes, that is correct.
>
> Q:    Okay. Ultimately, at that point in time, if you don't come in with an active prescription, is it safe to say that the provider still had the ability to place them on an MOUD if the provider thought it was clinically appropriate?
>
> A:    Yes, that is correct.

*Depo. L. Lynn*, p. 134, line 24-p. 135, line 7, p. 136, line 21-p. 137, line 4, Ex. 2. Because Plaintiff indicated he was going through withdrawal and because he tested positive for Fentanyl, he was placed on a Clinical Opiate Withdrawal Scale Protocol ("COWS").[1] The first COWS assessment was completed by LPN Elizabeth Butcher on January 2, 2023 at 1:46 a.m. Plaintiff's score was a 1, indicating he was not even in mild withdrawal. *January 2, 2023, COWS Assessment*, Ex. 3. Plaintiff then refused his detox assessment at 8:00 a.m. on January 2, 2023. *January 2, 2023, Refusal*, Ex. 4.

At 1:30 p.m. on January 2, 2023, Leslie Young attempted to call Cabin Creek Clinic, where Plaintiff claimed he received his Suboxone, to verify this. Ex. 1. At 1:33 p.m., Nurse Practitioner

---

1 The Clinical Opiate Withdrawal Scale (COWS) is an 11-item scale designed to be administered by a clinician. This tool can be used in both inpatient and outpatient settings to reproducibly rate common signs and symptoms of opiate withdrawal and monitor these symptoms over time. The summed score for the complete scale can be used to help clinicians determine the stage or severity of opiate withdrawal and assess the level of physical dependence on opioids.

Tamara Kessel started Plaintiff on an opiate Clonidine taper.[2] In addition to the Clonidine, Plaintiff was also prescribed Ibuprofen for muscle aches, Pepto-Bismol for diarrhea, Bentyl for abdominal cramping, Zofran for vomiting, Folic Acid, and Multivitamins. *Medication Records*, Ex. 5.

Plaintiff's next COWS assessment was at 11:27 p.m. on January 2, 2023. His score was a 0. *Second January 2, 2023, COWS Assessment*, Ex. 6. Plaintiff then underwent a COWS assessment at 10:00 a.m. on January 3, 2023. His score was a 1. *January 3, 2023, COWS Assessment*, Ex. 7.

Also on January 3, 2023, Nurse Practitioner, Tamara Kessel, evaluated Plaintiff for his detox assessment. Plaintiff reported that he did not have any nausea, vomiting, or diarrhea (N/V/D), and did not have any cough, chills, sweats, body aches, restless, chest palpitations, shortness of breath, dizziness, abdominal pain, jaundice or feeling ill. *January 3, 2023, Medical Sick Call*, Ex. 8. Additionally, he reported eating and drinking well, normal bowel movements and urination. *Id.* He denied suicidal ideations or previous suicide attempts. *Id.* He had appropriate behaviors and was alert and oriented x 3. *Id.* He stood unassisted, had no ataxia, and unlabored breathing. *Id.* His color was appropriate, and his vital signs were stable. *Id.*

At that time, Ms. Kessel obtained Plaintiff's pharmacy records. She verified that Plaintiff did not have an active prescription of Suboxone at that time. Plaintiff received a seven-day supply of Suboxone from Barbara Michael, M.D., on December 20, 2022. *Pharmacy Records*, Ex. 9. Thus, as testified to by Lara Lynn, HSA, Plaintiff was not immediately eligible to continue Suboxone. Ex. 2. However, as testified to by Lara Lynn, HSA, the medical care provider, in this case, Tamara Kessel, had the ability to examine Plaintiff and determine whether he should be started on MOUD. Yet, based on Tamara Kessel's deposition, she did not believe it was necessary to call Dr. Mitcheff[3] or

---

2 Clonidine is used to help ease the symptoms of withdrawal. *Depo. L. Lynn*, p. 99, lines 17-20.
3 Dr. Mitcheff is the Wexford Health Sources, Inc. Corporate Medical Director for Addiction Medicine.

Dr. Kulka[4] to potentially start him on MOUD given the lack of withdrawal symptoms at the time of her examination. *Depo. T. Kessel*, p. 166, line 23 – p. 167, line 24, Ex. 10.

Plaintiff's next COWS assessment was at 10:42 p.m. on January 3, 2023. His score was a 13, indicating moderate withdrawal. *Second January 3, 2023, COWS Assessment*, Ex. 11. The next COWS assessment was twelve hours later at 10:46 a.m. on January 4, 2023, at which time his score was 1. *January 4, 2023, COWS Assessment*, Ex. 12. He then underwent a COWS assessment at 12:31 a.m. on January 5, 2023, in which his score was 14, also moderate withdrawal. *January 5, 2023, COWS Assessment*, Ex. 13. Plaintiff refused his detox assessments on January 6 and 7, 2023. *January 6 and 7, 2023, Refusals*, Ex. 14. On January 8, 2023, at 12:10 a.m., Plaintiff's COWS score was 1. *January 8, 2023, COWS Assessment*, Ex. 15. Plaintiff was brought to the medical unit approximately two hours later at 2:38 a.m. complaining of chest pains. His vital signs were normal and his EKG was normal. No signs of distress were noted. Ex. 1.

Plaintiff refused his detox assessment on January 8, 2023. *January 8, 2023, Refusal*, Ex. 16. His COWS assessment on January 9, 2023, at 12:22 a.m. was a 0. *January 9, 2023, COWS Assessment*, Ex. 17. Plaintiff underwent his 14-day physical on January 9, 2023, which was a normal examination. *Health Assessment*, Ex. 18. Plaintiff underwent a COWS assessment on January 9, 2023, at 10:14 p.m. in which his score was 1. *Second January 9, 2023, COWS Assessment*, Ex. 19. He then underwent a COWS assessment on January 10, 2023, at 11:12 a.m., in which his score was also 1. *January 10, 2023, COWS Assessment*, Ex. 20. He refused his detox assessment on January 11, 2023. *January 11, 2023, Refusal,* Ex. 21. His last COWS assessment was on January 12, 2023, at 12:13 a.m. in which his score was 0. *January 12, 2023, COWS Assessment*, Ex. 22. No more medical treatment was requested or rendered from that point until Plaintiff's release from CRJ on March 9, 2023. In fact, Plaintiff declined to be seen for his HCV diagnosis and declined mental health

---

4 Dr. Kulka is the West Virginia Regional Medical Director.

treatment prior to his release. *February 8, 2023, Refusal*, Ex. 23; *MH Chronic Care Form*, Ex. 24.

## II.   SUMMARY OF ARGUMENT

It is from this set of facts that Plaintiff has filed his Amended Complaint against Wexford and the WVDCR. Plaintiff alleges that the Defendants forced him to suffer a "painful and medically unjustified withdrawal from his prescription Suboxone." (ECF No. 36, ¶ 4). Plaintiff alleges that he had obvious need for this medicine and Defendants refused to provide it to him. *Id.* He alleges that he suffered weeks of intense physical and mental anguish and had a return of his opioid cravings and relapsed as a result thereof. *Id.,* ¶ 5. Plaintiff alleges that Wexford has a policy of forcibly withdrawing inmates from MOUD. *Id.*, ¶ 53.

As a result, Plaintiff asserts one cause of action – violation of his Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Wexford failed to provide him with appropriate medical care or access to medical care through its policy of forcibly withdrawing him from Suboxone and not prescribing it to him upon intake. *Id.*, ¶¶ 134-135. Plaintiff alleges that this conduct was objectively unreasonable and deliberately indifference to Plaintiff's serious medical need and as a result, he suffered injuries, including extreme physical and mental distress. *Id.*, ¶¶ 136-138.

However, as will be more fully explained below, at the conclusion of discovery, zero evidence exists that Wexford had a policy of forcibly withdrawing all inmate who came into CRJ with an Opioid Use Disorder (hereinafter "OUD") diagnosis. Further, there is zero evidence that Plaintiff was going through withdrawal from Suboxone as he describes during the timeframe in question, and extremely limited evidence that he was experiencing any withdrawal at all. The evidence is clear that Wexford had a policy at all relevant times to provide inmates who had active prescriptions of MOUD upon intake a continuation of this medication. Plaintiff had no such

prescription. Further, Wexford had a policy that allowed the onsite provider to make a medical determination as to whether an inmate who did not have an active prescription upon intake should be started on MOUD. Ms. Kessel found upon examining Plaintiff that he did not have such a medical need based on the lack of withdrawal symptoms. Simply no evidence exists to establish that Wexford had a custom, policy, or practice that denied Plaintiff's constitutional rights. The decision by Ms. Kessel not to initiate Plaintiff on MOUD upon intake was an individualized clinical decision which was not dictated by Wexford policy. Therefore, as a matter of law, Wexford is entitled to summary judgment.

## III.   STANDARD OF REVIEW

Rule 56(a) of the *Federal Rules of Civil Procedure* provides that:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

F.R.C.P., Rule 56(a). In analyzing the application of Rule 56, this Court has held that:

> At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried; if not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly.

*Workman v. United Artists Theatre Circuit, Inc.*, 84 F.Supp.2d 790 (S.D. W.Va. 2000).

Furthermore, "[s]ummary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'' *Kitchen v. Summers Continuous Care Center, LLC*, 552 F.Supp.2d 589, 592 (S.D.W.Va. 2008) (*quoting* F.R.C.P, Rule 56(c)). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, a case involving solely a question of law is ripe to be resolved at the summary judgment stage. *See Rogers v. City of Richmond*, 851 F. Supp. 2d 983, 985 (E.D. Va. 2012); *see also Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2006) ("[a] purely legal question . . . is always capable of decision at the summary judgment stage . . . .") (internal quotation and citation omitted).

It is important to note that genuine disputes of material facts are not demonstrated by the bald statements of a non-moving party in depositions. *Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 167 (4th. Cir. 1988). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Unsupported speculation by a non-moving party is insufficient to defeat a summary judgment motion. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126 (4th Cir. 1987.) Mere unsupported speculation is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## IV.   ARGUMENT

### A.   Wexford is entitled to summary judgment regarding the Plaintiff's 42 U.S.C. § 1983 claim, as he has failed to adduce evidence of an official policy or custom of Wexford which violated his constitutional rights.

Claims under 42 U.S.C. § 1983 are specifically directed at "persons." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 60, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). However, a private corporation is liable under § 1983 **_only_** when an official policy or custom of the corporation causes the alleged deprivation of federal rights. See, e.g., *Little v. Tygarts Valley Reg'l Jail*, 5:12-cv-148, 2013 U.S. Dist. LEXIS 152265, 2013 WL 5744780, at *2 (N.D. W. Va. Oct. 23, 2013) (Stamp, J.) (noting that defendant corporation was not a "person" for purposes of 42 U.S.C. § 1983, and that

where there are no allegations against it involving policies or customs of deliberate indifference such entity should be dismissed); *Rowe v. PrimeCare Med. of W. Virginia, Inc.*, 2009 U.S. Dist. LEXIS 86037, 2009 WL 3063429, at *2 (S.D.W.Va. Sept. 21, 2009) (Chambers, J.) (finding no liability under section 1983 for the defendant corporation where there was no basis for concluding that the defendant corporation's involvement extended beyond the fact that it employed health care workers who treated plaintiff).

An official policy is proven in one of three ways: (1) a written ordinance or regulation, (2) affirmative decisions by policymaking officials, or (3) omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). This ensures that those held liable "are responsible only for 'their own illegal acts.' They are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original).

As with a corporation such as Wexford, policy may be made through formal decision-making channels or through "custom [which] may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691). A custom becomes attributable to the entity "when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d, 1380, 1387 (4th Cir. 1987). A showing of policy through deliberate indifference requires "continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional

deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (internal citations omitted).

The Supreme Court has urged particular caution where *Monell* liability is premised on either deliberate indifference or on custom. *Board of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* Thus, a plaintiff must point to a "specific deficiency or deficiencies . . . such as to make the specific violation almost bound to happen, sooner or later." *Spell*, 824 F.2d at 1390. "Neither the existence of such a policy or custom nor the necessary causal connection can be established by proof alone of the single violation charged." *Id*. at 1388.

Though deliberate indifference is typically considered an Eighth Amendment claim, where the claimant "was a pretrial detainee and not a convicted prisoner at the time of the alleged denial, this claim is governed by the due process clause of the fourteenth amendment rather than the eighth amendment[]." *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (citing *Revere v. Mass. Gen. Hosp.*, 463 U.S. at 244)). "The due process rights of a pretrial detainee are at least as great as the eighth amendment protections . . . while the convicted prisoner is entitled to protection only against punishment that is cruel and unusual, the pretrial detainee . . . may not be subjected to any form of punishment." *Id.* (internal quotation marks omitted). The Fourth Circuit has held that "a pretrial detainee makes out a due process violation if he shows 'deliberate indifference to serious medical needs' within the meaning of" Eighth Amendment jurisprudence. *Id*.

In this case, the record does not show that Wexford employed a blanket policy of forcibly withdrawing inmates from pre-incarceration MOUD treatment, nor a blanket policy of denying

MOUD treatment to inmates without a pre-incarceration MOUD prescription at the times implicated by the Complaint.  As has been consistently testified to by Wexford and WVDCR, and reflected in Wexford's MAT/MOUD guidelines, inmates who enter WVDCR custody with an active prescription for a MOUD medication are continued on that medication.  As WVDCR Director of Correctional Healthcare, Ayne Amjad, M.D., testified, a prescription is considered active if they still have remaining doses of their most recent prescription, and the time period of the most recent prescription has not lapsed at the time they enter custody.  *Depo. A. Amjad*, p. 139, line 18 – p. 140, line 9, Ex. 25. Further, all WVDCR and Wexford personnel knowledgeable on the subject have testified – and Wexford's MAT/MOUD guidelines reflect – that even inmates who entered custody without an active prescription can be evaluated for treatment in the MAT/MOUD program, and entered into the program if it is deemed clinically appropriate. *Wexford MAT/MOUD Guidelines*, Ex. 26. Whether a MAT/MOUD program is clinically appropriate for a given inmate is within the judgment of the provider.

Wexford's MAT/MOUD treatment guidelines in force at the time are of record in this matter and speak for themselves. Ex. 26.  They plainly show that the guidelines set forth by Wexford[5] is that inmates who enter custody with an active MOUD prescription are to have that prescription continued, and that inmates who come in without an active MOUD prescription be evaluated for induction onto MOUD, and given a prescription if deemed clinically appropriate by the providers. This is reflected in the testimony of the relevant policymakers and caregivers.  As Dr. Amjad, WVDCR's applicable Rule 30(b)(6) Corporate Representative, testified:

---

5 As Rule 30(b)(6) Corporate Representative for Wexford and author of the MAT/MOUD Guidelines, Michael Mitcheff, D.O., testified, Wexford does not have "policies," it has "guidelines," because Wexford's provider employees are medical professionals who treat patients according to their own medical judgment. *Depo. M. Mitcheff, D.O.*, p. 9, lines 3-21, Ex. 27.

Q:      Okay. And I am not trying to catch you up or be difficult here. I'm just trying to understand how the language and the contract and what's laid out here compares to what is happening in the facilities.

A:      If I can, let me explain what is supposed to happen and what is happening or traditionally happens. If someone comes in, they have a verified prescription of the medication, they're going to be started on what they were taking on the outside last week. If they don't have anything verified, they can't prove that I filled last Wednesday my Suboxone, I didn't fill it a month ago, that's not considered verified. Now, I'm going to come in and say, well, I took it a month ago, I use opioids, I've been screened now and my drug screen has heroin, fentanyl, you name it; now I've been diagnosed as an opioid use disorder person, but I have to be going -- if I just used a day or two ago, I'm not completely withdrawing yet. That person will have to be through a mild, moderate withdrawal stage before initiation of this MAT program. Is that considered detox in between? Yes, because that person is going through withdrawal, detoxification. But you don't put those people directly on the medication. There has to be a time frame in between, because the medication won't work if they're -- if they still have it in their system. And I think that's where we're getting this word salad.

[…]

Q:      I just want to clarify. So I was -- I want to talk specifically about this period from January to March of 2023, so early 2023. Is it your testimony that DCR and Wexford were inducting individuals onto MOUD treatment at that time?

A:      I can't be specific. Because I was not in -- looking at things that closely at that time. But if we go by the policies, then, yes, they should have been doing those treatments.

Q:      So even if someone did not have an active outside prescription for MOUD, if they were determined to have OUD upon intake, they should have been inducted on MOUD?

A:      If they were given the diagnosis, they were actively in moderate to severe withdraw based on those COWS protocol and if the provider or any other circumstances deemed it appropriate, then based on our policies, yes, given all those different scenarios.

*Depo. A. Amjad, M.D.*, p. 14, line 14 – p. 41, line 18; p. 102, lines 1-18.  This comports with the testimony of Wexford's Rule 30(b)(6) representative and author of the Wexford MAT/MOUD Guidelines, Michael Mitcheff, D.O., who testified at length on the topic. *Depo. M. Mitcheff, D.O.* at, e.g., p. 89-98.

11

When Plaintiff was admitted to CRJ on January 1, 2023, he did not have an active MOUD prescription.  His last prescription was for a 7-day supply, given by Barbara Michael, D.O., on December 20, 2022.  It thus expired on December 27, 2022, and had not been renewed at the time he was taken into custody.  In fact, Dr. Michael testified the only way the prescription could be renewed was if Plaintiff physically returned to her office for an appointment, which he did not do. *Depo. B. Michael*, p. 28, lines 5-14.

Nonetheless, Plaintiff was screened for entry onto an MOUD regimen in accordance with the Wexford guidelines.  Tamara Kessel, the Nurse Practitioner at CRJ who assessed the Plaintiff for entry onto MOUD did not determine in the exercise of her medical judgment that he was going through withdrawal, or that treatment with a buprenorphine MOUD medication was appropriate or necessary.

> Q:   Okay. So what you're saying is, even in early 2023, where the policy was only people with active prescriptions could get their MOUD, there are some circumstances in which somebody could get it; is that true?
>
> A:   If medically indicated, and I could reach out to our administration staff, Doctor Mitcheff, our addiction specialist, and ask if there were circumstances that things would be different than what our guidance was at that time.
>
> […]
>
> Q:   Was there anything that you observed in your examination that's recorded here that would have caused you to call Doctor Mitcheff or Doctor Kulka to potentially start him on an MOUD medication as -- under the guidelines in place in January of 2023?
>
> MS. CARAMADRE: Objection, vague, incomplete hypothetical.
>
> A:   In my notes, I do not see any documentation that I felt this patient had moderate or severe withdrawal symptoms.

*Depo. T. Kessel*, p. 86, line 16 – p. 87, line 1; p. 167, lines 15-24.  She further testified that, during the time period relevant to this case, inmates at CRJ were in fact receiving MOUD medication

treatment. *Id*. at p. 168, lines 1-3. This also echoes the testimony of CRJ Health Services Administrator Lara Lynn to the same effect and cited *supra*. *Depo. L. Lynn*, p. 134, line 24 – p. 135, line 7; p. 136, line 21- p. 137, line 4. This is reflected in Wexford's MAT/MOUD treatment statistics for the applicable time period, which shows many inmates receiving all of three different forms of MOUD treatment. *Wexford MAT/MOUD Treatment Statistics*, Ex. 28.  The fact that Ms. Kessel exercised her clinical judgment with respect to Plaintiff in a way with which Plaintiff disagrees, or even believes to have been unconstitutional, does not amount to evidence of an official policy or custom which satisfies *Monell*.

The only person who testified to the alleged existence of an official policy or custom of forcibly withdrawing inmates from MOUD medication is Plaintiff's retained expert, Michael Fingerhood, M.D. However, Dr. Fingerhood's opinion is simply not based on sufficient information to come to that conclusion.  In his expert report, he opined that Wexford "medical staff forcibly and quickly ends MOUD treatment for all people entering custody (except pregnant patients) with OUD needs." *Fingerhood Expert Report* at ¶ 61, Ex. 29.  He admitted in deposition testimony that his only basis for believing this to be true was that Plaintiff's counsel had proffered to him that this was the case, and his review of the Plaintiff's medical records.

> Q:    You state that this was Wexford's policy, where did you get that this was a policy?
>
> A:    I believe from speaking with the attorneys of Kaplan and Grady.
>
> Q:    Okay. So you didn't review any documents that titled this as a Wexford policy, correct?
>
> A:    I believe that I received a summary of Wexford policy, which I have.
>
> […]

Q:     Okay. You testified earlier, and correct me if I'm wrong, that when I asked you about Wexford's policy on forced withdrawal, that that information came from Mr. Taylor's counsel, correct?

A:     Yes.

Q:     Okay. What have you done to confirm that to actually be the policy?

A:     I have not.

[…]

Q:     I have a few follow-up. Other than Joseph Taylor, are you aware of any other inmates in the West Virginia Prison or jail system that were not prescribed MOUD or OUD upon intake?

A:     No.

*Depo. M. Fingerhood, M.D.*, p. 37, lines 6-13; p. 60, 4-11; p. 106, lines 13-17, Ex. 30. Even if his opinions were not directly contradicted by the hard evidence on the record, reviewing a proffer from counsel and a single inmate's medical records is wholly insufficient to conclude that there is a company-wide policy of forcibly removing inmates from MOUD medications, and plainly does not show an official policy sufficient to satisfy *Monell*. Summary judgment as to this claim is therefore unavoidably appropriate.

Evidence sufficient to establish the subjective elements of the *Monell* standard are also unmet on the record, as there is no evidence of intentionality or deliberate indifference on the part of the relevant policymakers. As Drs. Amjad and Mitcheff testified to at length, the availability of MOUD in correctional settings is a relatively young and still-evolving. Nonetheless, they still strive to navigate the administrative hurdles of federal grant funding and correctional security concerns to make MOUD available to as many inmates for whom such treatment is deemed clinically appropriate as they can.

Q:     Got it. Related to opioid use disorder among the inmate patients, what responsibility do you have over treatment of that disease?

14

A:      Well, as I said, I wrote the guidelines for -- for Wexford and I teach the guidelines and recommend, you know, the majority of what's in the guidelines, which is universal screening, universal treatment whenever possible. We have to work within the parameters of our clients, of course, related to cost and operational issues and so on. So -- so my responsibility is to be sure we optimize treatment, get as many people into treatment as we can, make sure that everybody's – you know, understands what our -- what our goal is and update the guidelines as we're able to when it comes to the treatment. In West Virginia, the client is responsible for the cost of all opioid use disorders. So we have to be stewards of that -- of the cost and figure out how we can treat the most amount of people within those guidelines.

[…]

Q:      So have you had any discussions about the cost for providing MOUD in West Virginia?

A:      Oh, we have, certainly, because we do have to work within the parameters that are given and within the budget, and that's how we come up with a priority list. I know the leadership in West Virginia, the medical leadership, would love to also expand the program completely, you know, to treat everybody with an opioid use disorder and having buprenorphine is even more of an option than it is now. But, you know, we have to be reasonable and roll it out in a reasonable way.

Q:      And who sets the budget for MOUD?

A:      I believe the Department of Correction, but I'm not sure what involvement other agencies have in that, to be honest with you.

*Depo. M. Mitcheff, D.O.*, p. 56, line 12 – p. 57, line 8; p. 145, lines 4-19.

Q:      And you began in your position in December of 2022?

A:      Yes.

Q:      So since you began working as the medical services director, how has the nature of OUD care changed?

A:      Since I have started, we have increased access to care probably four to five times. For an example, when I started, I think there was a total 300 to 400 people on some type of MOUD. When I looked last week for our March report, it was 2,400 or so individuals now being treated. To me -- to me, that was impressive.

15

Q:    And why has this level of care increased?

A:    Well, that was part of my reason -- that was one of my goals when starting this job, was to increase access to care, not just from what I knew on a provider personal level, but that was also the goal of DCR, was to improve this access because we knew this is what we need to do, so that was one of the main focuses when I started.

Q:    And so speaking more specifically, how has the practice of OUD care changed since you began working with DCR?

A:    So when I started, initially the reason it was called the Vivitrol policy was because that was all -- we had a lot of funding for Vivitrol and that was the easiest way to give the medication. It's an injection. And at the time, it also included anyone who has a prescription for an MOUD, I will say Suboxone. And then, of course, if someone wanted to get screened or be treated, they have to put in requests. One of the things that I initially heard when I started was the time it's taking for the Suboxone film to be distributed in med passes. It took, we'll say, average 15 minutes. They had to watch individuals, so it was taking a long time for staff. So that was why we, meaning Wexford, DCR started talking. If we could use the pill form, it can be crushed. That time can be cut in half. Then it wouldn't be so difficult to get -- increase the access of that medication. So that's how we got to the pill form, which opened up more people being eligible, available, seeking help at that time. And so that's where we're at now. Because of that changing the form of the medication available, you know, the delivery time shortened and helped.

*Depo. A. Amjad, M.D.*, p. 29, line 2 – p. 31, line 1.

To the extent the evidence on the record can be read to show that Plaintiff, or some other number of inmates in West Virginia, may have been appropriate for OUD treatment and did not receive it, this standing alone would not show deliberate indifference. The Court is well aware from the record of this case and the realities of the opioid epidemic in West Virginia of the administrative and security related limitations and hurdles involved in delivering a controlled substance to a correctional population which, as Plaintiff repeatedly points out, contains within it a substantial population with an opioid addiction. This alone does not show intentionality or deliberate indifference – it shows difficulty. Even Plaintiff's retained expert, Dr. Fingerhood, acknowledged that in substantially every jail and prison in the country, not every single inmate with OUD will

receive MOUD treatment. *Depo. M. Fingerhood, M.D.*, p. 46, line 14 – p. 47, line 1. But the Guideline documents and testimony of the policymakers and treating professionals of record in this case show a determined and increasingly-successful effort to overcome those difficulties. There is no factual showing on the record to show an official policy or custom of intentional or deliberately indifferent forced withdrawal from MOUD medications on the part of Wexford, and therefore summary judgment is appropriate.

## V.    CONCLUSION

**WHEREFORE**, based on the foregoing, the Defendant, Wexford Health Sources, Inc. respectfully prays this Honorable Court **GRANT** its Motion for Summary Judgment, and grant it such other relief as the Court deems just and proper.

**WEXFORD HEALTH SOURCES, INC.,**
**By Counsel,**

/s/ Jordan K. Herrick
Jordan K. Herrick (WV Bar #11128)
Adam K. Strider (WV Bar #12483)
BAILEY & WYANT, PLLC
500 Virginia Street, East, Suite 600
Post Office Box 3710
Charleston, West Virginia 25337-3710
T: (304) 345-4222
F: (304) 343-3133
jherrick@baileywyant.com
astrider@baileywyant.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

**JOSEPH TAYLOR,**

    **Plaintiff,**

**v.**

    **Civil Action No. 2:23-cv-00475**
    **Honorable Irene C. Berger**

**WEXFORD HEALTH SOURCES, INCORPORATED and WEST VIRGINIA DIVISION OF CORRECTIONS AND REHABILITATION,**

    **Defendants.**

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that a true and correct copy of foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WEXFORD HEALTH SOURCES, INC.'S MOTION FOR SUMMARY JUDGMENT** was served upon the following parties through the Court's Electronic Case Filing (ECF) system on this day, April 15, 2024:

Sarah Grady
David H. Sinkman
Amelia Caramadre
Nabihah Maqbool
Kaplan & Grady, LLC
2071 N Southport Ave, Ste 205
Chicago, IL 60614
Attorney For: Plaintiff

Lydia C. Milnes
Lesley M. Nash
Mountain State Justice, Inc.
1029 University Avenue
Suite 101
Morgantown, WV  26505
Attorney For: Plaintiff

William E. Murray
Jennifer E. Tully
Justin C. Taylor
Bailey & Wyant, PLLC
500 Virginia St. East, Suite 600

Charleston, WV  25301
Attorney For: West Virginia Division of Corrections and Rehabilitation

/s/ Jordan K. Herrick
Jordan K. Herrick (WV Bar #11128)
Adam K. Strider (WV Bar #12483)