UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

JOSEPH TAYLOR

       *Plaintiff*,

   v.

WEXFORD HEALTH SOURCES, INCORPORATED,
and WEST VIRGINIA DIVISION OF CORRECTIONS
AND REHABILITATION,

       *Defendants*.

Civil Action No. 2:23cv00475
Honorable Irene C. Berger

PLAINTIFF'S MEMORANDUM
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT AGAINST
THE WEST VIRGINIA DIVISION OF CORRECTIONS AND REHABILITATION

I.      INTRODUCTION

Plaintiff Joseph Taylor brings this case because the West Virginia Division of Corrections and Rehabilitation ("WVDCR") and Wexford Health Sources, Inc. (collectively the "Defendants") forced him to withdraw from his Medication for Opioid Use Disorder ("MOUD"), refusing to provide him this life-saving medication because of their discriminatory policy treating the needs of people with Opioid Use Disorder ("OUD") differently than people with other types of disabilities. Plaintiff seeks summary judgment on his claims against WVDCR for violation of the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") of 1973.

Plaintiff specifically asserts claims for WVDCR's repeated refusal to provide him with his previously prescribed and medically necessary MOUD to treat his OUD—a disability under the ADA—during his incarceration at Central Regional Jail ("CRJ") from January through March 2023. In denying him this medication, WVDCR discriminated against Plaintiff by treating him differently from incarcerated people with other medical needs and disabilities, in violation of the

ADA and Section 504 of the RA. In addition, WVDCR's MOUD policy constitutes a per se violation of the ADA and the RA.

## II.    STATEMENT OF UNDISPUTED FACTS

### 1.    Opioid Use Disorder is a Disability Requiring Medical Treatment.

Opioids are a highly addictive class of drugs that inhibit pain and cause feelings of pleasure. Ex. 1 (Fingerhood Rep.) ¶ 7. Opioid use disorder, or OUD, is a progressive brain disease that often becomes more severe over time. *Id.* ¶ 13. OUD disrupts a person's dopamine system, which plays a key role in feeling pleasure, movement, memory, and other body functions and is crucial for the brain to feel a sense of normalcy and perform cognitive functions necessary for survival. *Id.* ¶ 18.

While certain opioids have legitimate medical uses, chronic opioid use causes physical dependence and painful withdrawal symptoms. *Id.* ¶ 8. Withdrawal symptoms include opioid cravings, depression, suicidal ideation, anxiety, nausea and vomiting, tremors, hypothermia, hypertension, tachycardia, and muscle pain. *Id.* At high enough doses, opioids can halt breathing, creating risk of death or irreversible brain damage from oxygen deprivation. *Id.*

Contrary to popular belief, "[p]eople with OUD cannot simply 'will' or 'reason' their way out of continued opioid use, even when they are aware of the dire consequences." *Id.* ¶ 21. "OUD has therefore proven especially *resistant* to non-medication-based treatment methods, such as abstinence-only and twelve-step programs, which have been popular in treating alcoholism and other addictions." *Id.* (emphasis added). As a result, MOUD is widely regarded as an essential medical intervention for this chronic brain disease. *Id.* ¶ 36 n. 24, 25.

OUD typically involves cycles of relapse and remission, but "[w]ithout medication, patients with OUD are rarely able to control their use of opioids, often resulting in physical harm or premature death, including accidental overdose." *Id.* ¶¶ 15, 17. Tragically, West Virginia leads

the nation in per capita opioid overdose fatalities and Kanawha County, where Plaintiff lives, is the epicenter of the State's overdose crisis. *Id.* ¶ 12.

Medications to treat OUD include methadone, buprenorphine, and naltrexone. *Id.* ¶ 29. Each of these medications is distinct and has a separate mechanism of action. Ex. 2 (Fingerhood Rebuttal Rep.) ¶¶ 39-51. MOUD is proven to reduce the symptoms of withdrawal and cravings that people often experience in the absence of opiates—increasing the likelihood of treatment success. *Id*. at 29-31. Numerous studies have shown that MOUD access in correctional facilities reduces overdose deaths, opioid use, and criminal recidivism rates, and increases the likelihood of continued addiction treatment. *Id.* ¶ 35 n.19. For years the American Medical Association has recognized MOUD to be the "standard of care for patients in jail and prison settings." *Id.* ¶ 32.

### 2. Joseph Taylor was Denied MOUD at Central Regional Jail.

Plaintiff Joey Taylor is a native of Clendenin, West Virginia. Ex. 3 (Taylor Dep.) at 8. When Joey was approximately 15 years old, he was in a car accident that resulted in doctors prescribing him opioids for pain. *Id.* at 32. As a result of these prescriptions, Mr. Taylor became addicted to opioids. When he could no longer secure prescription drugs as a teenager, he "moved on to heroin because it was cheaper." *Id.* at 32. Mr. Taylor has additionally used fentanyl and methamphetamines. *Id.* at 32. His opioid addiction has consumed nearly half his life. Dkt. 2 (Taylor Decl. ¶ 2).

Mr. Taylor is diagnosed with and suffers from OUD, which Wexford itself graded as "moderate/severe" in February 2023. Ex. 4 (Jan. 2023 Chart Notes) at WEX20; Ex. 5 (Cabin Creek Record) at P13. Over the years Mr. Taylor's OUD was treated with the MOUD Suboxone, a version of buprenorphine, under the supervision of medical staff at several facilities. Ex. 3 at 32-33. In April 2022, Mr. Taylor was prescribed MOUD through Cabin Creek Health System.

Because of the relapsing nature of OUD, he experienced some gaps in his treatment in 2022. Ex. 1 ¶¶ 15-16; Ex. 6 (Michael Dep.) at 28. Mr. Taylor filled his Suboxone prescription on December 13 and December 20 of 2022. Ex. 20 (Taylor Pharmacy Records) at WEX152. When his medication ran out on December 27, Mr. Taylor was unable to refill his prescription because he did not have transportation to return to the clinic. Ex. 3 at 74.

Mr. Taylor's physician, Dr. Barbara Michael, testified that had Mr. Taylor returned to the Cabin Creek facility for a follow-up appointment, he would have been provided with another seven-day course of Suboxone. Ex. 6 at 30. During her deposition Dr. Michael explained that she would not characterize Mr. Taylor's prescription as "inactive," but rather, "he had not returned for follow-up in order to receive a new prescription." *Id*.

On January 1, 2023, Mr. Taylor was arrested and detained at CRJ. Ex. 3 at 13. Immediately upon entering CRJ, Mr. Taylor reported to intake staff that he was suffering withdrawal from Suboxone prescribed by Cabin Creek Health. WVDCR Resp. to Req. to Admit No. 1 and No. 2. The medical staff at CRJ contracted by WVDCR intake forms that he was suffering from Suboxone withdrawal, based on a Clinical Opiate Withdrawal Scale ("COWS") and Rapid Opioid Dependence Screen ("RODS"). Ex. 22 (Opioid Use Screener); Ex. 23 (Jan. 3-5, 2023 COWS) at P651, P653. Both assessments indicated Mr. Taylor had a clinical need for MOUD. Ex. 1 ¶ 98. Medical staff made just two calls to Cabin Creek on January 2 to confirm his prescription. Ex. 4 at WEX20; Ex. 22. When those were unsuccessful and no contact with Cabin Creek staff was made, staff recorded no further attempts to verify Mr. Taylor's prescription, not even checking the state's records to identify if Mr. Taylor had been provided a controlled substance. *Id.*; Ex. 8 (Kessel Dep.) at 165. Mr. Taylor was provided a urine drug screen, which tested only for buprenorphine and not its metabolite norbuprenorphine, which stays in the body longer and could have indicated

whether Mr. Taylor had taken buprenorphine medications in the preceding two weeks. Ex. 2 ¶¶ 12-14.

Based on CRJ staff's failure to verify his prescription or properly identify whether he had buprenorphine or buprenorphine's metabolites in his urine, WVDCR refused to continue Mr. Taylor on his Suboxone. WVDCR Resp. to Req. to Admit No. 3. Staff did not assess Mr. Taylor to determine whether, notwithstanding their failures above, MOUD was appropriate or medically necessary to address his symptoms. Instead, as WVDCR admits, Mr. Taylor was simply placed on a withdrawal protocol while at CRJ. Ex. 7 (WVDCR Resp. to Req. to Admit) at 41 (Req. No. 3).

To "treat" his withdrawal, the facility provided only over-the-counter medications to treat symptoms, ignoring the withdrawal itself and his underlying disease, OUD. Ex. 3 at 38; Ex. 2 ¶ 37. In the days after arriving at CRJ, Mr. Taylor's withdrawal symptoms grew worse and included insomnia, migraines, muscle spasms, and heart palpitations. Ex. 3 at 39. Mr. Taylor explained that his withdrawal symptoms grew so bad at times that he "didn't know where [he] was," and fellow incarcerated people on his unit would bring him his food trays because he was "puking up guts every day" and unable to get out of bed. *Id.* at 40. Mr. Taylor's physical withdrawal symptoms lasted for at least ten days, and the mental symptoms lasted much longer:

> [T]he first few days were just a blur. Agonizing. At night I would literally beat my head on the wall sometimes just trying to go to sleep because I just could not sleep. I hurt so bad. That lasted for well over ten days. And then once the body aches stopped and the insomnia kind of idles down, then it's just the cravings. They keep you up at night. That – it makes my anxiety worse. The mental part lasted for a couple weeks after that.

*Id.* at 48.

For Mr. Taylor, opioid cravings "feels like wanting something all the time but you can never have it. All you can think about, it's the only thing that's your mind, you're thinking about getting them or you're thinking about using." *Id.* at 77. Mr. Taylor explained why the opioid

cravings were so stressful: "Well, the cravings, you know, cause anxiety because all I can think about is if heroin comes in here, man, I'm not going to be strong enough to not use it. And then I know I'll die because I don't have a tolerance to it and just adds to the worry, man." *Id.* at 49.

Dr. Fingerhood, a professor of medicine and public health at John Hopkins University and a specialist in addiction medicine and treating OUD, testified that the withdrawal symptoms experienced by Mr. Taylor were typical of those with OUD. Ex. 9 (Fingerhood Dep.) at 95-96. He noted that when a person with OUD like Mr. Taylor is diagnosed with other mental health conditions, going through withdrawal exacerbates the severity of the symptoms of those underlying mental health conditions. *Id.* at 92-93. The denial of MOUD to Mr. Taylor exacerbated Mr. Taylor's symptoms of anxiety and major depressive disorder. *Id.*

Mr. Taylor repeatedly told staff at CRJ that he was withdrawing from Suboxone and that he had a valid Suboxone prescription from his outside provider, Cabin Creek. Ex. 3 at 41. Medical staff first said that the prescription would have to be "validated," and later refused to provide him his MOUD because "we haven't got a hold of nobody yet." *Id.* One nurse informed Mr. Taylor that "I don't care what your doctor's giving you on the street. You're already on this detox all the way off it. I'm not giving you Suboxone in my jail." *Id.* at 42. For two weeks, Mr. Taylor filed inquiries via the CRJ kiosk asking for MOUD, or the policies regarding it. Mr. Taylor asked staff, "am I on the list for the sublacate [sic] shot?" and "can I get a copy of the suboxone rules and regulations please." Ex. 10 (CRJ Inquiries) at P1-5; Ex. 7 at 41 (Req. 3). Despite his numerous requests, he never received any individualized assessment to determine whether he should be provided MOUD.

Mr. Taylor was able to make bond after ten weeks and was released from CRJ on March 8, 2023. Ex. 3 at 53. Having been provided no access to MOUD while detained at CRJ, his dreaded

opioid cravings had returned. *Id.* at 70. Mr. Taylor immediately relapsed, *id.* at 54, and because Mr. Taylor's tolerance to opioids had substantially decreased, he suffered a near-death overdose. *Id.* at 53. Mr. Taylor's wife and cousin were only able to revive him by shaking, smacking, and then pouring water on him until he "came back." *Id.* at 54.

### 3.  WVDCR Had a Policy of Denying MOUD to Incarcerated People with OUD.

Defendant WVDCR is the state agency responsible for all regional jails and state prisons in West Virginia. W. Va. Code § 15A-3-2. WVDCR contracts with Wexford, a for-profit medical provider, to provide medical care at all regional jails and state prisons in West Virginia, including CRJ. Ex. 11 (Amjad Dep.) at 27. While not directly providing care, WVDCR remains responsible for overseeing contract implementation and ensuring Wexford's compliance with all statutes, including the ADA and RA. *Id.*; Ex. 12 (Minnix Dep.) at 182-183.

WVDCR acknowledges that OUD is a disability under the ADA. Ex. 12 at 174-75; *see also* Ex. 11 at 61-62. In the medical services agreement that was in effect in January 2023, Wexford and WVDCR state that MOUD "reduces recidivism, illegal drug overdose deaths, and infectious disease transmission." Ex. 13 (WVDCR/Wexford Services Contract Excerpt) at P275. Despite acknowledging the need to treat OUD, individuals at WVDCR were still at great peril: In 2022 and 2023, there were opioid overdose deaths and suspected opioid overdose deaths at WVDCR jails. Ex. 14 (Wexford Death Records) at WEX6779-6786, WEX6423, WEX6806-08, WEX6792-6799.

Despite acknowledging the benefits of MOUD, at the time of Mr. Taylor's detention in CRJ, WVDCR maintained a policy whereby detainees were given MOUD or access to MOUD *only* if there was a verified prescription that was considered "active" at the time of the detainee's detention in a WVDCR facility. Ex. 8 at 66; Ex. 15 (WVDCR RFP) at WVDCR3255. WVDCR's

corporate representative stated that an "active" prescription was one taken "on a regular basis." Ex. 11 at 139. Indeed, the WVDCR–Wexford contract specified that Wexford was required to "continue any inmate coming into the facility with a *verified* MAT [Medication Assisted Treatment] prescription on such medication, so long as the same is medically necessary." *Id.* (emphasis added). At the time of Mr. Taylor's incarceration, there were no policies or practices in place which permitted a patient for whom an MOUD could not be verified (or was determined not to be "active") to be given an individualized assessment to determine whether an MOUD prescription was necessary or appropriate. Ex. 11 at 42-43.

DCR's medical staff, contracted through Wexford, admit that as of January-March 2023, Wexford would only provide MOUD or access to MOUD to a person with OUD if they arrived with "an active script," or active prescription for MOUD. Ex. 8 at 121-122. WVDCR had no "policy, instruction, directive" about how to verify prescriptions from community health providers. Ex. 12 at 109-110.

Mr. Taylor was not the only person who was withdrawn from his MOUD for not having an "active" prescription. One individual filed a grievance stating: "Prescribed Suboxone outside of here-have not received treatment since being here. Need MAT [Medication Assisted Treatment] here and to see an actual physician due to inhumane withdrawal." Ex. 19 (Inmate Grievance Log) at WEX3180. In response, he was simply informed his urine drug screen had not been positive for buprenorphine and that he had not picked up his most recent seven-day supply of Suboxone, and so was ineligible for MOUD because he "[d]id not have a current prescription on intake." *Id.*

If a WVDCR detainee was not confirmed to have an active MOUD prescription, he or she was automatically placed on "medically supervised detox meds[,]" thereby being removed from their MOUD through forced withdrawal. Ex. 11 at 135-136. This "detox" was set out in the

Request for Proposals for medical services by WVDCR. Ex. 15 at WVDCR3256. Notably, there was no individualized determination of whether a particular patient should or should not be given access to MOUD before being forced into withdrawal. *Id*. WVDCR's contracted medical providers admit that this violated the standard of care for treatment of OUD at that time. Ex. 8 at 113.

The WVDCR-Wexford contract stated that pregnant individuals in WVDCR custody were eligible to receive buprenorphine-based medications, and that pregnant women who have OUD but were not receiving MOUD would "immediately" receive Subutex. Ex. 13 at WVDCR3255 P282. But for non-pregnant individuals, in lieu of any individualized assessment and treatment, WVDCR offered a single form of MOUD: a Naltrexone-based medication called Vivitrol. *Id.* But even Vivitrol was restricted to individuals who were within 6 months of their release date,[1] or incarcerated people who agreed to participate in specialized therapy-based housing programs. Ex. 12 at 96-97, 99; Ex. 18 (WVDCR Policy 453.07 (2022)) at 2.

WVDCR's policies and practices relating to medical treatment for people with OUD were markedly different than for people with other types of disabilities. For individuals incarcerated at WVDCR, having OUD was not sufficient to qualify for the form of MOUD they required—individuals had to prove they had a pre-existing prescription, *or* be pregnant, *or* opt into a therapy-based housing program *or* be incarcerated for a limited and definite period. Such additional requirements are not placed on other medical conditions. *E.g.,* Ex. 21 (Wexford Medical Guidelines) at WEX1284 (explaining the process for treating a patient with diabetes). WVDCR acknowledges that medication is the only acceptable accommodation for people with OUD—yet WVDCR denies that very accommodation to those with OUD. Ex. 12 at 195-196.

---

[1] Because he had not yet been sentenced, Mr. Taylor did not have a discharge date and so it appears that Mr. Taylor and other detainees like him who were being detained pending trial were categorically ineligible to receive Vivitrol. Ex. 18 at 2.

As a result of WVDCR's policies and practices, incarcerated people with OUD are routinely denied access to MOUD in a manner that is unlike the way WVDCR treats people with other disabilities.

### III.    STANDARD OF REVIEW

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate "[w]here the unresolved issues are primarily legal rather than factual." *Jeb Stuart Auction Serv., LLC v. West Am. Ins. Co.*, 122 F.Supp.3d 479, 486 (W.D. Va. 2015) (citing *Koehn v. Indian Hills Cmty. College*, 371 F.3d 394, 396 (8th Cir. 2004)). This standard does not mean that any factual dispute is sufficient to defeat judgment. Instead, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," if "there [is] no genuine issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986) (emphasis added). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Bowen v. Adidas Am. Inc.*, 84 F.4th 166, 172 (4th Cir. 2023) (quoting *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570 (4th Cir. 2010)); *see also Wilkins v. Montgomery*, 751 F.3d 214, 220 (4th Cir. 2014).

The nonmoving party must present admissible evidence of "specific, material facts" relevant to the legal elements of the case sufficient to create this actual dispute: "the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion." *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).

"Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Id.*

## IV.    ARGUMENT

### A.  WVDCR Discriminated Against Mr. Taylor by Denying Him Access to MOUD, Treating Him Differently than Other Incarcerated People with Disabilities

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Title II authorizes suits by private citizens for money damages against public entities that violate § 12132." *U.S. v. Georgia*, 546 U.S. 151, 154 (2006). Title II of the ADA applies to those incarcerated in state-run correctional institutions. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998).

To prevail on a claim under Title II of the ADA for discrimination based on a disability, a plaintiff must demonstrate "(1) that he has a disability or has been regarded as having a disability; (2) that he is otherwise qualified to receive the benefits provided by a public entity; and (3) that he was denied those benefits or was otherwise discriminated against on the basis of his disability." *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020).

### 1.  Mr. Taylor has a disability as defined under the ADA.

To establish a disability under the ADA, a plaintiff must show: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such impairment. 42 U.S.C. § 12102(2). WVDCR admits that Mr. Taylor is regarded as having a disability under the ADA. Ex. 11 at 61; Ex. 12 at 180. Mr. Taylor has provided ample evidence that his OUD is an impairment

that substantially limits one or more of his major life activities. There can be no legitimate dispute that Mr. Taylor has a disability as defined in Title II of the ADA.

### a. Opioid Use Disorder is a Recognized Disability Under the ADA.

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities, . . ." 42 U.S.C. § 12102(1)(A). ADA's implementing regulations explicitly state that "drug addiction" constitutes a physical or mental impairment. 28 C.F.R. § 35.108(b)(2).[2] Courts have uniformly found that OUD can qualify as a disability under the ADA. *See, e.g.*, *Johnson v. Dixon*, No. 23-cv-23021-ALTMAN, 2023 WL 6481252, at *3 (S.D. Fla. Oct. 5, 2023) ("OUD, like other drug addictions, *can* qualify as a disability under the ADA."); *Strickland v. Del. Cnty.*, No. CV 21-4141, 2022 WL 1157485, at *3 (E.D. Pa. Apr. 19, 2022) (finding incarcerated plaintiff to be a "qualified individual with a disability in the form of his OUD."). This Court has already found OUD to be a disability under the ADA, Dkt. 65 at 9, and it is undisputed that Mr. Taylor has OUD. Mr. Taylor has a "disability" as defined by the ADA.

### b. Mr. Taylor Qualifies for ADA Title II Protections Because of the "Drug Rehabilitation" Exemption.

Title II of the ADA makes clear that an individual **shall not be denied health services, or services provided in connection with drug rehabilitation**, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services." 42 U.S.C. § 12210(c) (emphasis added); *see also* 28 C.F.R. §§ 35.131(b)(1).

WVDCR's corporate representative confirmed that individuals with substance use disorders may request ADA accommodations, Ex. 12 at 195, and that medication is a reasonable

---

[2] On the "Opioid Use Disorder" webpage hosted by the U.S. Department of Justice's Civil Rights Division ("DOJ"), the DOJ not only makes clear that the ADA protects people in recovery from OUD, it provides several examples of discrimination against people with OUD. One example listed is: "A jail does not allow incoming inmates to continue taking MOUD prescribed before their detention." https://www.ada.gov/topics/opioid-use-disorder/.

accommodation for OUD. *Id.* at 181. WVDCR was aware it would have to provide accommodations people with substance use disorders broadly—WVDCR even has a specialized form authorizing the "Release of Confidential Substance Use Disorder Patient Records" as part of its ADA policy so that WVDCR can provide such accommodations. Ex. 17 (WVDCR Policy 450.02 (2021)) at 21.

Mr. Taylor's claim under Title II of the ADA is that he was denied health services—MOUD—on the basis of his disability. There is no factual or legal dispute that Mr. Taylor is a qualified individual with a disability who was entitled to protections against discrimination with regard to the provision of health services under Title II of the ADA.

### c.  Mr. Taylor's Impairment—OUD—Substantially Limits One or More of His Major Life Activities.

To prevail on a claim under the ADA, Mr. Taylor must show that he has a diagnosed disability that substantially limits one or more of his major life activities. As set forth in the ADA regulations implementing, a "substantially limiting impairment" is one that "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.*

There can be no dispute that OUD substantially limits a person's major life activities. People with OUD have difficulty with "cognitive functions necessary for survival," and the three-stage cycle of OUD "is extremely disruptive to individual's major life activities." Ex. 1 ¶¶ 15, 17, 18. When left untreated, the undisputed evidence shows that Mr. Taylor's OUD results in constant cravings for opioids, which he describes as "wanting something all the time but you can never have it. All you can think about, it's the only thing that's your mind, you're thinking about getting

them or you're thinking about using." Ex. 3 at 77. Such cravings substantially impaired Mr. Taylor's ability to concentrate and think clearly. Moreover, when going through opioid withdrawal, Mr. Taylor suffered significant adverse physical effects, and describes going through withdrawal as "a blur," *Id.* at 48, which was so painful that at times he "didn't know where [he] was," and other detainees had to bring him food trays as he was unable to get out of bed. *Id.* at 40. The undisputed evidence of record demonstrates that Mr. Taylor's OUD substantially limits one or more of his major life activities.

### 2. Mr. Taylor was "Otherwise Qualified" to Receive the Benefits Provided by WVDCR, A Public Entity.

There is no dispute that WVDCR, the state agency tasked with running West Virginia's correctional facilities, is a public entity. *See Yeskey*, 524 U.S. at 210 ("State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.' § 12131(1)(B)."). The only question is whether Mr. Taylor was "otherwise qualified" to receive the benefit at issue, i.e., medical treatment for his OUD, while incarcerated at CRJ.

### a.    Medical Care is a "Benefit" Provided By WVDCR.

Courts have long held that incarcerated people "benefit" from the various activities, services, and programs available in correctional facilities, including, among others, rehabilitative programs and medical services. *Yeskey*, 524 U.S. at 210 (specifically listing medical services as a "benefit" afforded prisoners in the context of an ADA claim); *see also Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 290 (3d Cir. 2019) (noting that "the Supreme Court has stated that a prison's refusal to accommodate incarcerated people's disabilities 'in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs' constitutes a denial of the benefits

of a prison's services, programs, or activities under Title II." (quoting *U.S. v. Georgia*, 546 U.S. 151, 157 (2006))).

Here, the benefit at issue is the provision of medical care in a jail facility. Medical care is a benefit provided by WVDCR to all incarcerated people. Plaintiff asserts that WVDCR denied him access to medical care to treat his MOUD due to WVDCR's discrimination in treatment of people with OUD, as compared to people with other medical diagnoses and disabilities.

> **b.    Mr. Taylor Was "Otherwise Qualified" to Receive Medical Treatment While Housed in Central Regional Jail in January 2023.**

"A plaintiff asserting a violation of the ADA or Rehabilitation Act bears the burden to establish that he is qualified." *Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 462 (4th Cir. 2012). "A 'qualified' individual is one 'who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements' for participation in a program or activity." *Id.* (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005); 42 U.S.C. § 12131(2)). The "program" at issue in this case is medical treatment provided to people detained or incarcerated and within WVDCR's custody.

Here, Mr. Taylor was "otherwise qualified" to receive medical services while incarcerated at CRJ. Indeed, the only eligibility requirement necessary to receive access to medical services at CRJ is to be incarcerated, as WVDCR is obligated to provide adequate medical care to all people in its custody. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (holding that the Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care."). Thus, Mr. Taylor was otherwise qualified to receive medical services.

**3. Mr. Taylor's Disability Was a Motivating Factor in WVDCR's Denial of Benefits, i.e., Its Refusal to Treat His OUD.**

As to the final element of his ADA claim, Mr. Taylor presents overwhelming evidence that WVDCR discriminated against him in denying him access to MOUD because of his disability. For purposes of a claim under the ADA, a plaintiff need not prove that the discrimination occurred solely by reason of their disability but rather was a "motivating factor" in the discriminatory action. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999) (adopting "motivating factor" causation standard for Title II discrimination claims); *CMDS Residential, LLC v. Mayor of Baltimore.,* Civil Action No. CCB-21-1774, 2024 WL 1156309, at *3 (D. Md. Mar. 18, 2024) (the "motivating factor" test set forth in *Baird* is still controlling precedent in the Fourth Circuit).

The evidence in this case demonstrates that Plaintiff's diagnosis of OUD was a motivating factor in denying him treatment for his medical condition. First, as discussed above, WVDCR's discriminatory policy resulted in the denial of MOUD to Mr. Taylor. Second, WVDCR's practice of accommodating individuals with OUD differed from its practice of accommodating individuals with other medical needs, namely through its policy that denied needed access to medical treatment or an individualized assessment regarding Mr. Taylor's needed access to medical treatment.

**a. There is No Justification for WVDCR's MOUD Policy, Which Violates the ADA**

First, WVDCR had no legitimate justification, medical or otherwise, for failing to provide Mr. Taylor a medical treatment for his OUD in the form of MOUD. WVDCR implemented an unnecessarily restrictive criteria for Mr. Taylor and others with OUD to receive medication that was only in place for individuals with OUD, and not required for other medical diagnoses. Moreover, according to WVDCR's corporate representative, Mr. Taylor followed the "established procedure" within WVDCR to request information regarding the only MOUD available at CRJ at the time. Ex. 12 at 113; Ex. 10 at P1-5.

16

Despite his undisputedly adequate requests for information regarding MOUD, WVDCR and its contracted medical staff failed to take sufficient action. And as a result of WVDCR policy, staff could not take further action on Mr. Taylor's medical requests for MOUD. They also failed to make contact with Cabin Creek to confirm his status as a current patient with an ongoing MOUD prescription. WVDCR failed to adequately use other methods to verify his use of buprenorphine, such as a urine drug test for norbuprenorphine. Ex. 8 at 126-127. And WVDCR failed to use any state records to identify whether Mr. Taylor was on a controlled substance. *Id.* at 165. Even then, despite his medical records reflecting the moderate/severe opioid withdrawal he was undergoing, WVDCR would not start him on a buprenorphine medication or even conduct an individualized determination to assess whether access to MOUD was appropriate or medically necessary. Ex. 22; Ex. 23 at P651, P653. Courts have deemed that such an "out-of-hand, unjustified denial of the Plaintiff's request for her prescribed, necessary [opioid addiction] medication—and the general practice that precipitated that denial—is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability." *See Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146, 159-60 (D. Me. 2019), *aff'd*, 922 F.3d 41 (1st Cir. 2019).

In this way, WVDCR's MOUD policy constitutes a per se violation of the ADA. WVDCR's practice of providing accommodations for individuals with OUD differs from how it provides accommodations for individuals with other types of disabilities. As WVDCR testified, aside from medications, there are no "other accommodations that are granted to individuals with OUD under the ADA." Ex. 12 at 195; *id*. at 196 (testifying that the accommodation provided by WVDCR for patients who suffer from one or more qualifying disabilities because of a substance use disorder are "medications only"). By the terms of its own policies, WVDCR denies access to MOUD to detainees with OUD if they cannot prove that they have an "active" prescription.

WVDCR admits that it withholds the "only" accommodation provided for OUD without medical justification. *Id.*

Further, at the time of Mr. Taylor's incarceration, in order to qualify for the only form of MOUD that WVDCR offered incarcerated people to be started on Vivitrol, an individual would have to be within six months of his release date, or otherwise be required to be in specialized programs during his incarceration. *Id.* at 96-97, 99; Ex. 18 at 2. This is in contravention of the medical standards for OUD, which does not require an individual undergo behavioral therapy to receive MOUD. Ex. 1 ¶ 21; Ex. 9 at 69 ("That's why we've changed the term from medication assisted treatment to Medication for Opioid Use Disorder, because it's the medication that's crucial to prevent continued use and relapse.").

There is no legitimate reason to deny detainees with OUD access to MOUD or to force someone with OUD to withdraw from all forms of MOUD, and there is no legitimate reason to condition detainees' eligibility for MOUD treatment on participating in certain jail programming. Ex. 1 ¶¶ 38, 68. Such a prerequisite does not exist for any other disability accommodation at WVDCR. For instance, the medical guidelines for diabetic patients at WVDCR established "individualized treatment goals" because "very stringent goals may not be appropriate or practice for some patients." Ex. 21 at WEX1284. While Metformin is recommended to treat Type 2 diabetes "in combination with lifestyle changes," Metformin is not *withheld* if a patient does not enact those "lifestyle changes." *Id.* at WEX1285.

In addition, WVDCR policy at the time made a single form of MOUD available to non-pregnant patients—Vivitrol—despite the fact that other buprenorphine-based medications could be, and were, made available to pregnant patients with OUD. Ex. 12 at 142. However, forms of MOUD "are not interchangeable," and different medications may be appropriate for each patient

depending on an individualized assessment. Ex. 1 ¶ 52. WVDCR's records indicate that non-pregnant patients were being routinely discontinued from MOUD: in 2022, 64% of people incarcerated in the state were "NOT Continued on MAT," while only 1 of 5, or 20%, of pregnant patients were removed from MOUD. Ex. 2 ¶ 57; Ex. 16 (MAT Statistics) at WVDCR9851. In 2023, 32% of non-pregnant people were removed from MOUD, whereas only 9% of pregnant people were. Ex. 2 ¶ 58. WVDCR had no medical or operational justification for why individuals could not be continued on buprenorphine-based medications after the conclusion of a pregnancy.

The consequences of withholding or discontinuing MOUD are dire, even while a person with OUD remains incarcerated. Ex. 1 ¶ 103. For example, in the period immediately prior to Mr. Taylor's incarceration, there had been at least one death of a person in WVDCR custody caused by an opiate overdose in November 2022 (Ex. 14 at WEX6779-6786, WEX6423), and another two possible overdoses in October 2022 (*id.* at WEX6806-08), and January 2023 (*id.* at WEX6792-6799). WVDCR acknowledges the harms of being forcibly withdrawn from MOUD, but only for pregnant patients, "because of the risk to the fetus" Ex. 12 at 140. But there is no clinical reason WVDCR can cite as to why these risks are not present for all patients. Ex. 2 ¶ 53.

Records indicate that because of WVDCR's policies, thousands of people are not provided MOUD. WVDCR's Rule 30(b)(6) designee could not cite any national or medical standard it followed in establishing its policies regarding MOUD. Ex. 12 at 99-101. In fact, WVDCR's policy related to OUD are contrary to the Clinical Guidelines for the Bureau of Prisons.[3] Courts have found that "[a]bsent medical or individualized security considerations underlying the decision to deny access to medically necessary [MOUD] treatment, Defendants' policy . . . is either 'arbitrary or capricious-as to imply that it was pretext for some discriminatory motive' or 'discriminatory on

---

[3] Federal Bureau of Justice, "Opioid Use Disorder," (Aug. 2021), https://www.bop.gov/resources/pdfs/opioid_use_disorder_cg.pdf.

its face.'" *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 47 (D. Mass. 2018 (quoting *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006))).

## B.  WVDCR Discriminated Against Mr. Taylor Solely Because of His Disability in Violation of the Rehabilitation Act.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To prevail on a claim of discrimination under the RA, a plaintiff must show that the entity subject to the claim received federal financial assistance and further: "(1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995).

Other than the "federal funding requirement" of the Rehabilitation Act, the Fourth Circuit has held that "claims under the ADA's Title II and the Rehabilitation Act 'differ only with respect to the third element, causation.'" *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) (quoting *Halpern v. Wake Forest Univ. Health Sci.*, 669 F.3d 454, 461 (4th Cir. 2012)). "To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded solely by reason of his disability; the ADA requires only that the disability was a motivating cause of the exclusion." *Id.* (internal quotations omitted).

Other than the causation element, the ADA is "similar in substance to the Rehabilitation Act, and cases interpreting either are applicable and interchangeable." *Cox v. Callaway Cnty. Sheriff's Dep't*, No. 2:18-CV-04045-NKL, 2019 WL 1049389, at *2 (W.D. Mo. Mar. 5, 2019) (citing *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (quotation marks and citation

omitted). Accordingly, "[c]laims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." *Wicomico Nursing Home,* 910 F.3d at 750 (quoting *Seremeth v. Bd. of Cnty. Comm'n Frederick Cnty.,* 673 F.3d 333, 336 n.1. (4th Cir. 2012)). Indeed, the Fourth Circuit "interprets the ADA and the RA in lockstep." *Basta v. Novant Health Inc.,* 56 F.4th 307, 316 (4th Cir. 2022).

For these reasons, Plaintiff respectfully incorporates the arguments set forth in Section IV.A, and addresses only the two factors that cannot be "combined for analytical purposes," *Wicomico Nursing Home,* 910 F.3d at 750; i.e., whether WVDCR (1) receives federal funding, and (2) discriminated against Mr. Taylor *solely* by reason of his disability.

### 1. WVDCR receives federal funding and is subject to the RA.

Here, there is no dispute that WVDCR receives federal funding and is therefore subject to the RA. *See* WVDCR's Answer to Pl's Am. Compl., Dkt. 79, ¶129 (admitting that "WVDCR received federal funding.").

### 2. Plaintiff has presented undisputed evidence that WVDCR discriminated against him solely by reason of his disability, in violation of the RA.

As discussed in Section IV.A.*, supra*, Mr. Taylor has presented indisputable evidence demonstrating the three necessary elements required for a discrimination claim under both the ADA and RA. The evidence of record establishes that while incarcerated at CRJ from January through March 2023, Mr. Taylor was (1) a person with a disability (Opioid Use Disorder); (2) otherwise qualified to receive the benefits (medical services) provided by WVDCR; and (3) denied the benefit of those services (i.e., denied MOUD for treatment of his OUD) because of discriminatory animus toward people with OUD. To prevail on his RA claim, Mr. Taylor must demonstrate that WVDCR's discrimination against him was based *solely* on his disability, rather than his disability being a motivating factor. *See Wicomico Nursing Home,* 910 F.3d at 750.

Here, as set forth in Section A.3, *supra*, the evidence of record is plain: despite WVDCR's obligation to provide medical treatment to incarcerated people, it decided to take no action to ensure that incarcerated patients with OUD were provided treatment for their disease, even while ensuring that those with other diseases and medical conditions did receive treatment. Further, WVDCR treats accommodations for incarcerated people with OUD differently from the way in which it accommodates other disabilities. No medical justification exists for refusing MOUD to people with OUD, or for forcing people with OUD to suffer forced withdrawal, or for requiring participation in mandatory behavioral health programs before being prescribed MOUD, and no evidence exists to provide a non-discriminatory justification for WVDCR's policies. This Court should find that WVDCR discriminated solely on the basis of disability when it refused to provide MOUD to Joseph Taylor in January through March 2023.

## V.    CONCLUSION

WHEREFORE, for the reasons stated herein, Mr. Taylor respectfully requests this Honorable Court grant his motion for summary judgment against Defendant WVDCR and enter judgment in his favor on his ADA and RA claims, Counts I & II of the Amended Complaint.

**Respectfully submitted,**
**JOSEPH TAYLOR,**
**Plaintiff, by and through Counsel,**

/s/ Lydia C. Milnes
Lydia C. Milnes (WVSB #14158)
Lesley M. Nash (WVSB #10598)
Mountain State Justice, Inc.
1029 University Ave., Ste, 101
Morgantown, WV 26505
Phone: (304) 326-0188
Facsimile: (304) 344-3145
lydia@msjlaw.org
lesley@msjlaw.org

Sarah Grady (IL Bar No. 6312933) (Pro Hac Vice)

David Howard Sinkman (NY Bar No. 4684981) (Pro Hac Vice)
Amelia Caramadre (MA Bar No. 710230) (Pro Hac Vice)
Nabihah Maqbool (NY Bar No. 5717400) (Pro Hac Vice)
Kaplan & Grady LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
Phone: (312) 852-2184
Facsimile: (312) 626-6715
sarah@kaplangrady.com
sinkman@kaplangrady.com
amelia@kaplangrady.com
nabihah@kaplangrady.com