# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

JOSEPH TAYLOR,

        Plaintiff,

v.                                 CIVIL ACTION NO.   2:23-cv-00475

WEXFORD HEALTH SOURCES,
INCORPORATED, et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed *Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment* (Document 182), the *Memorandum of Law in Support of Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment* (Document 183), the exhibits submitted at Document 194, the *Plaintiff's Response in Opposition to Defendant Wexford's Motion for Summary Judgment* (Document 206), and the *Reply Memorandum in Support of Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment* (Document 209).

The Court has further reviewed *West Virginia Division of Corrections and Rehabilitation's Motion for Summary Judgment* (Document 186), *West Virginia Division of Corrections and Rehabilitation's Memorandum in Support of Motion for Summary Judgment* (Document 187), the exhibits submitted at Document 195, the *Plaintiff's Response in Opposition to Defendant West Virginia Division of Corrections and Rehabilitation's Motion for Summary Judgment* (Document 205), *West Virginia Division of Corrections and Rehabilitation's Reply in Support of Motion for*

*Summary Judgment* (Document 210) and *West Virginia Division of Corrections and Rehabilitation's Notice of Supplemental Authority in Support of Its Motion for Summary Judgment* (Document 233).

The Court has also reviewed the *Plaintiff's Motion for Summary Judgment Against the West Virginia Division of Corrections and Rehabilitation* (Document 188), *Plaintiff's Memorandum in Support of His Motion for Summary Judgment Against the West Virginia Division of Corrections and Rehabilitation* (Document 189), *West Virginia Division of Corrections and Rehabilitation's Response in Opposition to Plaintiff's Motion for Summary Judgment* (Document 202), and the *Plaintiff's Reply in Support of His Motion for Summary Judgment Against the West Virginia Division of Corrections and Rehabilitation* (Document 211).

In addition, the Court has reviewed the *Motion to Seal Various Exhibits to Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment* (Document 180) (sealed), the *Memorandum of Law in Support of Motion to Seal Various Exhibits to Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment* (Document 181) (public), the *Motion to Seal Various Exhibits to Defendant West Virginia Division of Corrections and Rehabilitation's Motion for Summary Judgment* (Document 184) (sealed), the *Memorandum of Law in Support of Motion to Seal Various Exhibits to Defendant West Virginia Division of Corrections and Rehabilitation's Motion for Summary Judgment* (Document 185) (public), the Plaintiff's *Motion to File Exhibits Under Seal and Temporary Seal* (Document 191) (sealed), the *Memorandum of Law in Support of Plaintiff's Motion to File Exhibits 5 and 14 to His Motion for Summary Judgment Under Seal and Exhibits 15, 16, and 18 Under Temporary Seal* (Document 192) (public), *Defendant Wexford Health Sources, Inc.'s Response to Plaintiff's Motion to File Exhibits Under Seal and Temporary*

2

Seal (Document 197) (public), *Defendant Wexford Health Sources, Inc.'s Response to Motion to Seal Various Exhibits to Defendant West Virginia Division of Corrections and Rehabilitation's Motion for Summary Judgment* (Document 198) (public), Defendant WVDCR's *Motion to File Exhibits Under Seal* (Document 199) (sealed), *Defendant West Virginia Division of Corrections and Rehabilitation's Memorandum of Law in Support of Motion to File Exhibits Under Seal* (Document 200) (public), the Plaintiff's *Motion for Leave to File Exhibit Under Seal* (Document 203) (sealed), and the *Memorandum of Law in Support of Plaintiff's Motion to File Exhibit 1 to Response to Defendants' Motions for Summary Judgment Under Seal* (Document 204) (public).

## MOTIONS TO SEAL

"The right of public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004). Under the common law, "[t]he trial court has supervisory power over its own records and may, in its discretion, seal documents if the public's right of access is outweighed by competing interests." *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984) (noting factors may include "whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event; and whether the public has already had access to the information contained in the records"). District courts have discretion to determine "whether to grant or restrict access to judicial records or documents" based on the facts and circumstances of the case. *Virginia Dep't of State Police*, 386 F.3d at 575.

In contrast, the First Amendment protects a narrower range of documents, but "[w]hen the First Amendment provides a right of access, a district court may restrict access only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Id.* (internal quotation marks omitted). "The burden to overcome a First Amendment right of access rests on the party seeking to restrict access, and that party must present specific reasons in support of its position." *Id.*

After determining whether the common law or First Amendment provides the right of access, a district court "must give the public notice of the request to seal and a reasonable opportunity to challenge the request; it must consider less drastic alternatives to sealing; and if it decides to seal it must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." *Id.* at 476. "Notifying the persons present in the courtroom of the request to seal or docketing it reasonably in advance of deciding the issue is appropriate" to provide public notice. *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984).[1]

Documents attached to a motion for summary judgment are subject to the First Amendment standard, even if the documents were "the subject of a pretrial discovery protective order." *Virginia Dep't of State Police*, 386 F.3d at 576; *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 252 (4th Cir. 1988) (explaining that discovery is "ordinarily conducted in private," while dispositive motions can "serve[] as a substitute for trial"). Thus, the First Amendment standard applies here, and access can be restricted only if there is a compelling countervailing interest. Any such restriction must be narrowly tailored.

---

1 The Court finds that the public has received sufficient notice via the filing of the memoranda detailing the seal requests on the public docket.

The parties each seek to seal exhibits that include the Plaintiff's medical records, as well as medical records of other inmates. The Court finds that the medical records contain confidential information that can be sealed without unduly restricting the ability of the public to follow and understand the proceedings. The Plaintiff has a compelling interest in maintaining the privacy of his medical records that substantially outweighs the public's interest in accessing those exhibits, and inmates not involved in this litigation have an even more compelling interest in preventing public access of their personal medical records. To the extent those records contain information relevant to the resolution of the motions for summary judgment, they are discussed in summary form, without extraneous details, in the briefing and within this opinion. Therefore, the motion to seal will be granted as to the following documents as private medical records: Documents 180-1 through 180-22 (Wexford's Exhibits 1, 2, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24); Documents 184-1 through 184-22 (DCR's Exhibits 1, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24); Documents 191-1 and 191-2 (Plaintiff's Exhibits 5 and 14); Documents 199-2 through 199-22 (DCR's Response Exhibits 5 and 7-26); and Document 203-1 (Plaintiff's Resp. Exhibit 1).

Wexford seeks to preserve the seal on two Guidelines documents, one for Medication Assisted Treatment/Medications for Opioid Use Disorder (Documents 180-23, Wexford Exhibit 26; 184-23, DCR Exhibit 26; and 199-1, DCR Resp. Exhibit 1), and one for Endocrine/Metabolic Disorders – Pharmacological Management of Type I and Type II Diabetes Mellitus (Document 191-6, Plaintiff's Exhibit 21). These documents contain detailed guidelines designed to assist medical professionals employed by Wexford in correctional facilities in providing treatment to patients with Opioid Use Disorder (OUD) and diabetes, respectively. Wexford argues that these

documents should be maintained under seal based on the potential for competitive harm if they are made public.   It explains that developing these guidelines is a time-consuming and expensive process and filing them publicly would harm its ability to distinguish itself from competitors bidding for contracts to provide healthcare to inmates.   Wexford cites cases finding that a corporation's interest in protecting proprietary and trade secret information can justify sealing court records.   It contends that redaction is not possible given the nature of the documents.

The Court finds that Wexford has not demonstrated that it has a compelling interest in maintaining the secrecy of the Guidelines documents sufficient to outweigh the public's First Amendment right to access court records.   While the Court does not doubt that Wexford invested time and money into developing the Guidelines, the nature of the information contained in the Guidelines is not particularly sensitive.   Medical standards of care and research surrounding OUD and diabetes are publicly available.   Wexford's care protocols and guidance for providers designed specifically for an inmate patient population appear to be drawn primarily from public medical sources.   Wexford provides care to inmates in taxpayer-funded facilities after contracting with governmental agencies.   The Guidelines documents touch on the central issues of the Plaintiff's claims, as well as matters of general public interest.[2]   Thus, the Court finds that the motions to seal as to Documents 180-23, 184-23, and 191-6 should be denied.

The Plaintiff further sought to file certain exhibits under temporary seal because the Defendants did not consent to removing the confidential designation.   Neither Defendant set forth

---

2 The Defendants rely in part on the fact that the Court previously granted a motion to seal the MOUD Guidelines when they were submitted in connection with a motion to compel.   As the Court explained in that *Memorandum Opinion and Order* (Document 177), the law is unclear as to the level, if any, of a public right of access to documents submitted in relation to discovery disputes.   The Court expressly did not determine "[w]hether Wexford's interest in maintaining the confidentiality of the Guidelines if they were submitted in connection with a dispositive motion or at trial outweighs a public right of access."   (Mem. Op. at 4.)

reasons supporting the continued sealing of Documents 191-3 (a DCR Request for Proposals for medical services at its facilities), 191-4 (statistical charts detailing MOUD provision to inmates in DCR custody), or 191-5 (DCR's Vivitrol policy). Thus, the Court finds that those exhibits should be filed on the public docket.

Finally, DCR seeks to seal MAC Meeting Minutes, filed at Document 199-23. This document contains minutes for meetings between Wexford and DCR reviewing the provision of healthcare and any incidents that occurred during relevant time periods. It contends that these records are confidential pursuant to W.Va. Code § 30-3C-3, which provides for the confidentiality of documents "prepared by or on behalf of a health care provider for the purpose of improving the quality, delivery, or efficiency of health care or for the purpose of credentialing or reviewing health care providers." Much of the information contained in the Meeting Minutes is potentially sensitive discussion of specific medical services provided to individuals, and relatively little of the information bears any direct relevance to the matters at issue in this case. The Court finds that both the statutory directive and the purpose underlying it, of ensuring thorough peer review of healthcare providers, support maintaining Document 199-23 under seal.

### FACTS[3]

The Plaintiff, Joseph Taylor, was incarcerated at Central Regional Jail (CRJ) from January 1, 2023, to March 9, 2023. Defendant West Virginia Division of Corrections and Rehabilitation (DCR) operates jails and correctional facilities in West Virginia, including CRJ. Defendant Wexford Health Sources provides medical care at DCR facilities, including CRJ.

---

3 Because the parties have submitted cross motions for summary judgment, the Court has recounted a summary of the relevant evidence propounded by each party, including disputed evidence.

Mr. Taylor has Opioid Use Disorder (OUD), a progressive brain disease. He became addicted to opiates when they were prescribed after an accident when he was a teenager. Medications for Opioid Use Disorder (MOUD) are the standard of care for treating OUD, and have a substantially higher success rate than abstinence-based programs. Even with treatment, people with OUD often relapse and return to use of opioids for periods of time. The medications for treatment of OUD include methadone, buprenorphine, and naltrexone. They have different mechanisms of action, and patients may be more successful on a particular medication. Some types of MOUD, including buprenorphine, help prevent overdose and death in the event of a relapse, in addition to helping patients avoid drug use. People being released from incarceration are at a heightened risk of overdose and death because their drug tolerance may be reduced while in custody.

Mr. Taylor was prescribed Suboxone, a version of buprenorphine, by Cabin Creek Health System in Clendenin, West Virginia, in April 2022. He filled Suboxone prescriptions from another provider on December 13, 2022, and from Cabin Creek on December 20, 2022. He stated that he lacked transportation to return to the clinic for another 7-day prescription on December 27, 2022. His prescribing physician, Dr. Barbara Michael, testified that she would have provided him another 7-day prescription if he had returned to the clinic.

Mr. Taylor was arrested on January 1, 2023, and detained at CRJ. He reported to intake staff that he was prescribed Suboxone by Cabin Creek Health and was in withdrawal from suboxone. Intake staff did a urine drug screen, and he tested positive for amphetamine, methamphetamine, and Fentanyl. He did not test positive for buprenorphine, and the test did not screen for norbuprenorphine, a buprenorphine metabolite that remains in the body for a longer

8

period   The medical staff completed an Opioid Use Screener, which confirmed his OUD.   Mr. Taylor's medical records from CRJ indicate that a staff member attempted to call Cabin Creek Clinic to verify his Suboxone prescription but did not reach anyone.   Dr. Michael testified that Cabin Creek used an answering service and always had an on-call provider, but they had no record of receiving an inquiry.   She explained that the on-call provider might or might not provide patient information, but if they had responded to a call to verify Mr. Taylor's prescription, they would have informed CRJ that he was a patient who had not returned for follow-up for his new prescription after completing the December 20, 2022 prescription.

Because Mr. Taylor tested positive for opiates and indicated that he was going through withdrawal at intake, staff placed him on a withdrawal protocol with over-the-counter medications designed to reduce withdrawal symptoms.   Staff also placed him on the Clinical Opiate Withdrawal Scale Protocol (COWS), which involves twice-daily assessments of withdrawal symptoms.   His COWS assessments resulted in scores of 0 or 1 on January 2 and the morning of January 3.   At 10:42 p.m. on January 3, 2023, he had a COWS score of 13.   The next morning, his score was 1.   At 12:31 a.m. on January 5, 2023, his COWS score was 14.   He declined assessments on January 6 and 7.   He testified that he was too ill to get out of bed and did not know where he was at times during his withdrawal.   On January 8, 9, and 10, he had COWS scores of 0 or 1.   He described symptoms including insomnia, migraines, muscle spasms, heart palpitations, vomiting, anxiety, and opioid cravings.   Mr. Taylor noted that there were days friends brought him meal trays because he could not get up.   Though the other symptoms largely dissipated after about ten days, the opioid cravings remained.   After he was released in March, 2023, he overdosed and reports that he nearly died.

9

Nurse Practitioner Tamara Kessel saw Mr. Taylor for a detox assessment on January 3, 2023. Her notes indicate no notable withdrawal symptoms and that he reported eating and drinking well. She testified that she did not independently recall any interactions with Mr. Taylor from his January-March incarceration at CRJ. Wexford guidelines called for the medical provider, Ms. Kessel, to be contacted if a patient's COWS score exceeded 12, but no record indicates that anyone contacted Ms. Kessel or that she followed up with Mr. Taylor in relation to his January 3 evening score of 13 or his early morning score of 14 on January 5.

Mr. Taylor testified that he repeatedly requested that he be provided with Suboxone to continue the treatment he was receiving prior to his incarceration, but was told that MOUD was only offered to those with a current prescription upon intake. He recalled one nurse telling him she was "not giving you Suboxone in my jail," regardless of the treatment provided by outside doctors. (Taylor Dep. at 42::15-16) (Document 195-6.) Mr. Taylor also submitted inquiries about MOUD. On January 21, 2023, he requested "a copy of the suboxone rules and regulations," and Lara Lynn, the Wexford Health Services Administrator, responded "[y]ou did not have a current order upon intake therefore you did not qualify for us to give you suboxone." (Taylor Inquiries/Grievances, Pl.'s Ex. 10) (Document 188-11.) On January 31, 2023, he asked whether he was on the list for the Sublocade injection, and Ms. Lynn responded that the "program is on hold until further notice." (*Id.*) Another inmate who filed a grievance seeking MOUD was similarly informed that they were ineligible because they "did not have a current prescription on intake" and had not tested positive for buprenorphine. (Inmate Grievance Logs, Pl.'s Ex. 19) (Document 188-20.)

Ms. Kessel and Ms. Lynn both offered testimony as to their understanding of who could receive MOUD at CRJ from January to March, 2023.   Ms. Lynn indicated that during that time period, Wexford offered Subutex, a form of buprenorphine, to "pregnant females on intake that were withdrawing from opioids," but no one else could access Subutex at that time.   (Lynn Dep. at 22::7-8) (Document 195.)   Suboxone, another form of buprenorphine, was available to people who had "a current prescription on intake, and we had to verify that prescription," and that was "the only way that somebody could have access to it."   (Lynn Dep. at 23::2-6.)   She stated that the policy changed in mid-2023 to provide access to people who entered with positive drug screens without active prescriptions.   However, Ms. Lynn also noted that the provider did have the ability to prescribe MOUD if they believed it to be clinically appropriate, even for patients who came in without an active prescription, although she did not testify as to any specific instances of that happening.

Ms. Kessel likewise testified that "when Wexford started with DCR in the jails, [buprenorphine] was for those people who have an active script for buprenorphine," and that continued until "sometime spring or summer of 2023."   (Kessel Dep. at 64:24 – 65:8.)   An active script meant one that was in effect upon entry, and if someone had missed the 7-day refill, it would not be considered active.   In addition to those with active scripts, "[t]here may have been situations that, if clinically indicated, we could try to get approval, talk to our addiction specialist, and see if there was a way to go ahead and start somebody prior to that," but Ms. Kessel did not recall ever doing so, though she did recall contacting Dr. Mitcheff related to patients' withdrawal symptoms.   (Kessel Dep. at 69::5-8.)   She again explained that "[i]n January [2023] … if they

had an active script, then we would continue it.   If they did not have an active script, then they were placed on a medically supervised detox med set."   (Kessel Dep. at 121:12-16.)

Even before the Medication Assisted Treatment (MAT) program was initiated beginning with patients who entered DCR custody with active prescriptions,[4] Wexford (and its predecessor) provided MOUD to pregnant patients.   During the January-March 2023 time period, pregnant patients who entered CRJ with opioids in their system were started on Subutex to ensure they did not go through withdrawal, which can present a risk of pregnancy complications.   They were not required to have an active prescription or have received previous treatment.   For non-pregnant patients, the experts differ on the ideal timing for starting buprenorphine.   The Defendants' experts and medical staff contend that patients must begin withdrawal and reach a COWS score of about 12, before initiating buprenorphine, while the Plaintiff's expert, Dr. Fingerhood, indicated that forcing patients into withdrawal is unnecessary and dangerous.

In addition to failing to continue patients whose outside prescriptions for MOUD had lapsed or to initiate patients with OUD onto MOUD, the Defendants often discontinued patients from MOUD.   In 2022, only 314 of 881 non-pregnant patients who were receiving MOUD before incarceration were continued on MOUD.   (Pl.'s Ex. 16) (Document 191-4.)   In 2023, 2118 of 3106 non-pregnant patients were continued on their MOUD, including 144 of 185 patients at CRJ who were receiving MOUD prior to incarceration.   (*Id.*)   The Plaintiffs note that the raw data for the spreadsheets include Mr. Taylor as a patient continued on his MOUD, even though he was denied MOUD during his January – March 2023 incarceration, suggesting potential underreporting

---

4 The Plaintiff objects to the term "active prescriptions," arguing that it is not a valid medical distinction.   The Court has continued to use the term as a description of the distinction made by the Defendants, despite the parties' disagreement as to the medical significance of a lapse between prescriptions.

of patients removed from MOUD.  Comments on a spreadsheet detailing statistics for MOUD programs at various facilities commend South Central Regional Jail for "rock[ing] it!" in reference to numbers showing nearly all of those screened for an MOUD program declined to participate. (Program Summary 8-12-22 & 9-1-22) (Document 205-4.)

Wexford created guidelines for providers, with the caveat that programs may differ based on the client correctional system, jail, or prison's preferences, and that providers retain flexibility to base decisions on their own medical judgment.  The Guidelines for Addiction Medicine and MOUD at the time recognized that MOUD is the "appropriate, first-line treatment for most patients, especially those with moderate to severe OUD," and that outcomes are better when patients receive MOUD.  (MOUD Guidelines at 5, Document 180-23.)  The Guidelines emphasize that "***individuals with OUD not on MOUD have a much higher risk of death from drug overdose in the first two weeks after release from prison compared to the general population***," and note that MOUD "works to reduce recidivism, reduce criminal behavior, decrease domestic violence, decrease infectious disease from intravenous drug use…, increases employment as well as increasing retention in recovery programming." (*Id.* at 4, emphasis in original.)  The Guidelines recommend consideration of naltrexone, buprenorphine, buprenorphine/naloxone, or methadone for patients with moderate to severe OUD and current opioid use.  For those who are post withdrawal, the Guidelines suggest long-acting injectable naltrexone, "in shared decision making with the patient," or buprenorphine or methadone, particularly for "patients with a history of success on prior medications for OUD." (*Id.* at 22.) Dr. Mitcheff, Wexford's corporate Medical Director of Addiction Medicine, Utilization Management, and Clinician Services, testified that, in general, under Wexford's Guidelines, a

patient with moderate or severe withdrawal, as reflected in the COWS scores, should be induced onto buprenorphine.    (Mitcheff Dep. at 90::22-24.)    His belief was that patients who were actively addicted to opioids were induced onto buprenorphine in West Virginia jails, not placed on medically supervised withdrawal, in January of 2023.    (*Id.* at 115:6 – 116:24.)

Dr. Mitcheff testified that in his view, "over the past five years, [buprenorphine has] really become the community standard" of care, though it has been in use much longer.    (Mitcheff Dep. at 28::16-17) (Document 195-3.)    He does regular trainings, both for medical staff and for non-medical administration staff, outlining how MOUD works, in part to reduce stigma.    Dr. Mitcheff distinguished between MOUD and other medications because buprenorphine is a controlled substance, requiring extra care to ensure responsible prescribing, particularly related to potential for diversion.    He indicated that Wexford's guidelines promote universal screening and treatment, but the client's policies override Wexford's, as when a state or jail restricts access to patients meeting certain criteria.    In addition, they "have to work within the parameters that are given and within the budget, and that's how we come up with a priority list" for MOUD treatment.    (*Id.* at 145::6-8.)    Dr. Mitcheff does not recall any provider contacting him related to Mr. Taylor's treatment while he was at CRJ from January to March of 2023.

Dr. Anye Amjad, DCR's Medical Director of Correctional Healthcare, testified that since she began in her position in December 2022, DCR and Wexford had worked together to increase access to MOUD.    Her understanding was that, at the time she started, OUD care "included anyone who has a prescription for an MOUD, I will say Suboxone.    And then, of course, if someone wanted to get screened or be treated, they have to put in requests."    (Amjad Dep. at 30::6-9) (Document 195-2.)    She testified that a patient who enters with a verified prescription

would be started on that prescription, and if the patient doesn't "have anything verified" they "have to be through a mild, moderate withdrawal stage before initiation of this MAT program" for the medication to work properly.  (*Id.* at 40:24-41:11.)  She indicated that DCR has not reviewed Wexford's Guidelines on OUD or its OUD treatment practices for compliance with the contract with DCR, and does not monitor the details of treatment for OUD in as much detail as "some of the other things like the physicals, dental exams.  It's been more of just counting the numbers of people on MOUD."  (*Id.* at 49::7-9.)

The DCR Request for Proposals (RFP) and Wexford's Response to RFP at the time Wexford won the contract to provide medical care in DCR facilities includes discussion of MOUD. The RFP notes that DCR had a goal of expanding the MOUD programs.  It states that a medical services vendor would be required to "continue any inmate coming into the facility with a verified MAT [medically assisted treatment] prescription on such medication so long as the same is medically necessary" and ensure appropriate MOUD treatment for pregnant patients.  (Response to RFP at 203) (Document 188-14.)  Wexford proposed implementing a program with "three phases: detoxification, recovery, and maintenance."  (*Id.* at 207.)  It indicates that it "does not detox pregnant patients," but instead provides MAT, in accordance with the applicable standards of care.  (*Id.* at 211.)  For non-pregnant patients, after detoxing, Wexford indicates that patients referred to the MAT program will receive a mental health evaluation and be screened to determine whether they are medically eligible to participate in MAT – except that patients already on buprenorphine on intake would be continued.

The Plaintiff's expert, Dr. Fingerhood, testified that Mr. Taylor, and all inmates with OUD, should have been offered MOUD upon intake at CRJ.  "Staff at the jail should have continued his

Suboxone prescription and/or initiated him onto a new prescription of Suboxone given his diagnosis, treatment history, and present withdrawal."  (Fingerhood Rep. at 15) (Document 188-2.)  "If a person is doing well on either buprenorphine or methadone treatment (or the versions of each), it is unsafe, ethically unsound, and violates the standard of care to require transition to naltrexone or to discontinue treatment." (*Id.* at 17.)  If a patient has untreated OUD, Dr. Fingerhood opined that induction of MOUD is the standard of care, and treatment should not be delayed.  "Failing to initiate treatment of a patient with untreated OUD with MOUD violates the standard of care because (like failing to continue MOUD) it is a failure to provide treatment for a chronic and often deadly brain disorder." (*Id.* at 18.)  He noted the risk of overdose from contraband drugs, as well as the increased risk of relapse and fatal overdose upon release for patients with OUD that is untreated during a period of incarceration.  Dr. Fingerhood explained that Mr. Taylor's score of 11/11 on the Opioid Use Screening indicated a high level of risk, and his COWS scores of 13 and 14 on two occasions further confirmed a need for treatment.  He noted that COWS scores can be understated depending on the person recording the information, and that fluctuation in scores may reflect the use of medications to alleviate symptoms as well as differences in the staff making the assessment.  Dr. Fingerhood states that "it is more urgent that people relapsing with illegal substance maintain access to their protective MOUD treatment," rather than having treatment discontinued. (*Id.* at 22.)  Dr. Fingerhood referenced Mr. Taylor's reported overdose following his release, explaining that it is consistent with statistics showing high rates of overdose, including overdose deaths, in the weeks immediately following release from incarceration for people with untreated OUD.

The Defendant's expert, Dr. Grady Bazzel,[5] opined that Mr. Taylor's COWS scores reflected no withdrawal or mild withdrawal, with the exception of the two higher scores. (Bazzel Rep. at 3) (Document 202-8.) Dr. Bazzel opined that the correctional setting presents barriers to the use of MOUD because of safety concerns, stating that "[t]he use of such medications that directly impact not only the patient, but other inmates as well must be done so with an abundance of caution." (*Id.* at 4.) He states that "[a]ppropriate patient selection is the key," and that some patients taking buprenorphine in the community may not "make a suitable candidate for it in a correctional setting." (*Id.*) He cites Mr. Taylor's gaps in treatment prior to his incarceration, his positive drug tests for fentanyl, methamphetamine, and amphetamine, and his refusal to complete some of the COWS assessments as factors indicating that he was not a good candidate for MOUD. Dr. Bazzel opined that Wexford's MOUD program was "supported by treatment guidelines," and that "the defendants met the standard of care in their treatment of Mr. Taylor." (*Id.*at 6.)

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v.*

---

5 The Court notes that there is a pending motion to exclude Dr. Bazzel's report and testimony. Including reference to it herein is not intended to suggest any ruling as to its ultimate admissibility.

*Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   A "genuine issue" concerning

a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict

in the nonmoving party's favor.   *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News &*

*Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material

fact, and that it is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); *Celotex Corp.*,

477 U.S. at 322–23.   When determining whether summary judgment is appropriate, a court must

view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light

most favorable to the nonmoving party.   *Hoschar*, 739 F.3d at 169.   However, the nonmoving

party must offer some "concrete evidence from which a reasonable juror could return a verdict in

his favor."   *Anderson*, 477 U.S. at 256.   "At the summary judgment stage, the non-moving party

must come forward with more than 'mere speculation or the building of one inference upon

another' to resist dismissal of the action."   *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at

*3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214

(4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and

determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of

credibility.   *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va.

Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986).   If

disputes over a material fact exist that "can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party," summary judgment is inappropriate.   *Anderson*,

477 U.S. at 250.   If, however, the nonmoving party "fails to make a showing sufficient to establish

18

the existence of an element essential to that party's case," then summary judgment should be granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review.  *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd,* 474 F. App'x 101 (4th Cir. 2012).   Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## DISCUSSION

### A.   *Wexford – 42 U.S.C. § 1983*

Defendant Wexford argues that it is entitled to summary judgment because the evidence establishes that Mr. Taylor was provided appropriate medical treatment.   Wexford contends that it did not have a policy of providing MOUD only to people with active prescriptions on intake, but instead permitted providers to determine whether a patient needed MOUD based on their medical judgment.   Based on the asserted lack of evidence of such a policy, Wexford argues that the Plaintiff cannot establish an official policy or custom, as required to hold a corporation accountable for a deliberate indifference claim.   It further contends that Mr. Taylor was appropriately evaluated, he did not have a current prescription for buprenorphine and did not have buprenorphine in his urine screen, and his medical records and COWS assessments showed only mild or

19

nonexistent withdrawal symptoms.  It asserts that "[t]he decision by Ms. Kessel not to initiate Plaintiff on MOUD upon intake was an individualized clinical decision which was not dictated by Wexford policy."  (Wexford Mem. at 6) (Document 183.)  Wexford further argues that there is no evidence that Mr. Taylor's overdose after his release "was proximately caused by not taking MOUD while in jail."  (Wexford Reply at 6) (Document 209.)

The Plaintiff argues that there is plenty of evidence in the record that would permit a finding in his favor.  He notes that there is no dispute that he has OUD and that the Defendants were aware of his OUD when he entered their custody.   There is also no dispute that, as reflected in his medical records, he informed Wexford staff that he was prescribed Suboxone by Cabin Creek Health Center.  He points to Ms. Kessel's testimony that, for a patient without an active prescription, MOUD could be provided only if she sought approval to depart from the policy limiting MOUD to those entering with an active prescription, which she did not recall doing during the time period Mr. Taylor was incarcerated at CRJ.   He argues that there is evidence, including his COWS scores of 13 and 14 and his own testimony describing his symptoms, that he was suffering severe withdrawal symptoms.  He argues that grievances from other inmates provide further evidence of a policy and practice of denying MOUD and forcing patients with MOUD into withdrawal.  He cites Wexford's responses to inquiries from Mr. Taylor and others seeking MOUD, informing them that they were ineligible because they did not have a current or active prescription upon intake.   Mr. Taylor also points to data showing the percentages of non-pregnant patients who were discontinued from MOUD at CRJ in 2022 and 2023.   The Plaintiff argues that Wexford's Guidelines, Dr. Mitcheff, and Ms. Kessel all recognized the dangers of failing to provide MOUD to patients with OUD, including the risk of relapse and overdose, and Wexford's

20

different treatment of pregnant patients demonstrates an understanding of the harm caused by the policy and practice of denying MOUD to non-pregnant patients.   He contends that the record does not support Wexford's assertion that Ms. Kessel provided an individualized medical assessment to determine that he did not need MOUD.   Thus, the Plaintiff argues that he has presented evidence sufficient to support his § 1983 claim against Wexford.

The Fourth Circuit recently held that the test for deliberate indifference under the Fourteenth Amendment is objective, in contrast to the subjective test applied for such claims under the Eighth Amendment.   *Short v. Hartman*, 87 F.4th 593, 608–09 (4th Cir. 2023) (relying on *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015)).   The court set forth the standard as follows:

> To state a claim for deliberate indifference to a medical need, the specific type of deliberate indifference claim at issue in this case, a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Id.* at 611.

There is evidence in the record that Mr. Taylor had OUD, and that OUD presents a substantial risk of serious harm.   He requested treatment with MOUD upon intake and on occasion thereafter, and Wexford's own Guidelines and staff members agree that treatment with MOUD is the standard of care for OUD.   Nonetheless, Wexford placed him on a medically supervised withdrawal protocol and did not prescribe MOUD.   There is no dispute that Wexford knew that Mr. Taylor had OUD and was going through withdrawal, though there is dispute as to the extent of his withdrawal symptoms.   There is factual dispute as to Wexford's knowledge of the

unjustifiably high risk of harm.    Wexford's Guidelines and Dr. Mitcheff recognized that failure to provide MOUD can lead to negative outcomes, including withdrawal and much higher risk of relapse and overdose death.    Ms. Kessel noted similar risks when OUD is not treated with MOUD. [6]    Mr. Taylor has presented evidence that he was harmed by suffering prolonged withdrawal symptoms, a return of his opioid cravings, and relapse and overdose following his release.

Because Wexford is a private corporation rather than an individual, the Plaintiff must also show that the deprivation of rights resulted from application of an official policy or custom. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999) (applying the "principles of § 1983 municipal liability articulated in *Monell* and its progeny" to private corporations).

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal punctuation and quotation marks omitted).

Much of the dispute in this case, both as to the Wexford claims and the DCR claims discussed below, centers on exactly what Wexford's policy was with regard to provision of

---

6 The Court notes that Wexford also presented testimony from Ms. Kessel and Dr. Bazzel indicating dispute as to whether Mr. Taylor was an appropriate candidate for MOUD based on Ms. Kessel's evaluation of his withdrawal symptoms, the lapse in his prescription for buprenorphine, his use of illegal substances prior to intake, and his negative urine screen for buprenorphine, although there is little evidence in the record connecting those factors to the applicable standard of care for treatment of OUD.    For purposes of Wexford's motion for summary judgment, the factual dispute regarding Mr. Taylor's symptoms and any dispute regarding the standard of care must be resolved in his favor.

MOUD. Both sides have presented sufficient evidence for a jury to find in their favor on that issue, and so the Court finds that summary judgment is not appropriate. The Plaintiff has presented evidence of his own treatment – he was denied MOUD despite undisputedly suffering from OUD – and contemporaneous communications in which Ms. Lynn informed him that he was not eligible for MOUD because he did not have an active prescription upon intake. Ms. Lynn and Ms. Kessel both stated at various points during their depositions that the policy or guideline in early 2023 was not to induce non-pregnant patients onto MOUD, and to provide it only if a patient entered with an active prescription, meaning their last prescription had doses remaining. The Plaintiff has also presented evidence that, in 2022 and 2023, a substantial percentage of non-pregnant patients were removed from MOUD. In addition, he has produced grievances from other inmates related to the denial of MOUD, some of which also contain responses stating that the denial is based on the lack of an active prescription on intake. A jury crediting that evidence could conclude that there was a policy or practice to deny MOUD to non-pregnant patients with OUD but without active prescriptions, and to discourage use of MOUD for all non-pregnant patients. Indeed, even if the jury credits the testimony from CRJ nurses that a provider could prescribe MOUD if they felt it was medically necessary, the jury could conclude that there was a policy to deny MOUD that impacted Mr. Taylor, despite potential exceptions to the policy.

Wexford, meanwhile, has presented evidence that it produced Guidelines that recommended broader use of MOUD to patients entering custody with drugs in their system and/or patients diagnosed with OUD, regardless of past treatment. It also points to testimony from Ms. Lynn and Ms. Kessel, indicating that if a provider believed a patient needed MOUD based on withdrawal symptoms or other factors, they could have consulted with Dr. Mitcheff for approval

23

to write a prescription for it even if the patient did not enter with a prescription, although Wexford did not present evidence of any specific instance in which a provider did so.   Dr. Amjad likewise testified that she understood the policy to permit providers to prescribe MOUD to patients without active prescriptions following an evaluation and determination that it was medically appropriate. There is also evidence from Dr. Mitcheff and Dr. Amjad indicating that Wexford and DCR were in the process of expanding access to MOUD in early and mid-2023.   A jury could credit the Defendants' evidence and find that there was no policy precluding the provider from prescribing MOUD to Mr. Wexford.   Because there is a genuine dispute of material fact as to the nature and existence of Wexford's MOUD policy and the consistency of its practices, Wexford's motion for summary judgment must be denied.

### B.   WV Division of Corrections – ADA and RA

The Plaintiff and DCR filed cross-motions for summary judgment as to the Plaintiff's claims pursuant to the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA).

DCR asserts a factual narrative similar to that put forth by Wexford regarding the Plaintiff's treatment.   DCR contends that it played no role in the provision of medical care to the Plaintiff, and any decisions regarding the Plaintiff's treatment and whether to provide MOUD were made solely by Wexford.   It further argues that there is no evidence of discrimination against patients with OUD, noting that hundreds of patients in DCR custody during the relevant time period were being treated with MOUD.   It contends that "proper MOUD guidelines were in place and followed by Wexford, and that Plaintiff was not placed on MOUD due to legitimate and reasonable medical reasons per the decisions of Wexford medical providers and Wexford guidelines."   (DCR Mem. at 15) (Document 187.)   DCR further asserts that the "Plaintiff is not entitled to the protections

under the ADA as a matter of law due to [his] illegal and current drug use."  (*Id.*)   It argues that

his RA claim fails because he "has not demonstrated that he is 'qualified' for the MOUD program

based on the medical evidence and testimony," relying on factors that it contends supported the

medical decision not to provide him with MOUD.  (*Id.* at 19.)    DCR contends that the "Plaintiff

was not treated differently than other inmates because of his disability, but treated differently

because of legitimate medical reasons, security reasons, his symptoms, and his own illegal drug

abuse."  (DCR Reply at 2) (Document 210.)

The Plaintiff argues that he is entitled to summary judgment as to his ADA claim because

his Opioid Use Disorder constitutes a disability for purposes of the ADA, he was entitled to the

benefit of medical services while in DCR custody, and he has presented evidence that

discrimination was a motivating factor in DCR's denial of access to medical treatment for his

OUD.   In response to DCR's argument that it had no direct role in provision of medical care, he

argues that the doctrine of respondeat superior applies to ADA and RA claims, and Wexford acted

as DCR's agent.   He further argues that DCR's documentation and statistics regarding MOUD

made DCR aware that OUD patients were not receiving treatment.   In addition, he contends that

the practice of refusing to induce patients with OUD onto MOUD unless they were pregnant or

entered with an active prescription "originated with the WVDCR-Wexford contract—one

expressly approved by WVDCR."   (Pl.'s Resp. at 10) (Document 205.)    He argues that the drug-

use provision of the ADA is not applicable because the ADA prohibits denial of "health services,

or services provided in connection with drug rehabilitation, on the basis of the current illegal use

of drugs."  (*Id.* at 12) (quoting 42 U.S.C. § 12210(c)).   For largely the same reasons, he argues

that he is entitled to summary judgment as to the RA claim because the evidence supports his

25

position that DCR took no measures to ensure that incarcerated patients with OUD received treatment, despite ensuring that patients with other conditions received treatment, and there is no evidence of a non-discriminatory purpose.   If the Court does not find that the Plaintiff is entitled to summary judgment, he argues that he has presented sufficient evidence to defeat DCR's motion.

DCR first asserts that it has no potential liability because Wexford was responsible for the provision of medical care and the decisions made with respect to Mr. Taylor's OUD treatment. The Fourth Circuit has rejected the "argument that there is no respondeat superior liability under the ADA…. Under the ADA and similar statutes, liability may be imposed on a principal for the statutory violations of its agent." *Rosen v. Montgomery Cnty. Maryland*, 121 F.3d 154, 157 n. 3 (4th Cir. 1997) (collecting cases, including cases addressing the Rehabilitation Act).   DCR does not appear to contest that Wexford is its agent.   Thus, the Court finds that DCR may be liable for violations committed by Wexford.

DCR further argues that Mr. Taylor was not protected by the ADA because he was an active user of illegal drugs.   42 U.S.C. § 12210(a) provides that "[f]or purposes of this chapter, the term 'individual with a disability' does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use."   As the Plaintiff points out, § 12210(c) provides that "notwithstanding subsection (a) and section 12211(b)(3) of this title, an individual shall not be denied health services, or services provided in connection with drug rehabilitation, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services."   There is little evidence that the "covered entity" acted to deny Mr. Taylor access to MOUD "on the basis of" his illegal drug use—and it would be entirely illogical to refuse to treat opioid use disorder in patients who *use opioids*.   Further, § 12210(c) expressly

26

provides that health services and drug rehabilitation services, which would include the MOUD Mr. Taylor sought, cannot be denied based on current illegal drug use.   Thus, the Court must reject DCR's argument that it is entitled to summary judgment on the basis that Mr. Taylor is excluded from ADA protection because of his illegal drug use.

The Fourth Circuit has addressed application of the ADA and Section 504 of the Rehabilitation Act, indicating that both "prohibit discrimination against an individual because of his or her disability."   *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). The analysis of the claims is "substantially the same."   *Id.*

> To establish a violation of either statute, plaintiffs must prove (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program or activity, or otherwise discriminated against, on the basis of their disability.

*Id.* (quoting *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016)).   "The two statutes differ only with respect to the third element, causation."   *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).   The ADA requires proof that "the disability was a motivating cause of the exclusion," while the Rehabilitation Act requires that the plaintiff prove "he was excluded solely by reason of his disability."   *Id.* at 461-62 (internal punctuation omitted) (citing *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999)).   A person is "qualified" to receive the benefits or services of a program if she "meets the essential eligibility requirements for participation in a program or activity," "with or without reasonable modifications to rules, policies, or practices."   *Halpern*, 669 F.3d at 462 (internal quotation marks omitted).

There is no dispute that Mr. Taylor suffers from OUD or that OUD constitutes a disability. As a person detained at CRJ, he was qualified to receive medical care, although there is dispute as

to whether he was an appropriate candidate for MOUD and whether the denial of MOUD was discriminatory. Mr. Taylor has presented evidence, including from his expert, that MOUD was the appropriate treatment for his OUD. As discussed in more detail above, there is factual dispute as to the nature and scope of the policy regarding provision of MOUD at CRJ during the period when Mr. Taylor was incarcerated. If a jury finds that there was a policy not to provide MOUD to patients for whom it was medically appropriate, in violation of the standard of care for treatment of OUD, with barriers to care not applied to patients with other diagnoses, the jury could conclude that DCR's failure to properly treat OUD was based on bias or discrimination toward patients with OUD. Mr. Taylor has also presented evidence that Wexford staff cheered high rates of refusal of MOUD at South Central Regional Jail, and he testified that a nurse told him she would not give him Suboxone in her jail, regardless of his treatment by outside providers. In addition, he presented evidence that pregnant patients with OUD were treated differently to ensure that they did not suffer withdrawal. Those facts could support a jury finding of discrimination, under the standards applicable to either ADA or RA claims.

DCR has presented evidence that the failure to provide MOUD was due to the individual provider's decisions based on Mr. Taylor's history and symptoms, rather than any policy. A jury could interpret the COWS assessments and medical records from the jail as showing relatively minor withdrawal symptoms on most days the assessments were given, and choose not to credit Mr. Taylor's description of his symptoms. DCR also produced testimony and evidence regarding the security considerations implicated in MOUD programs that provide controlled substances to patients in a correctional setting. Absent a policy to deny MOUD to eligible patients, a jury could conclude that there is insufficient evidence that OUD was treated differently than other medical

conditions except to the extent necessary to properly handle controlled substances.   A jury could find that any violation of the standard of care with respect to Mr. Taylor resulted from mistakes by the individual provider, not from a discriminatory policy disfavoring use of MOUD.   Because facts central to the issue of discrimination are disputed, the Court finds that neither party is entitled to summary judgment with respect to the ADA and RA claims.

**CONCLUSION**

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment* (Document 182), *West Virginia Division of Corrections and Rehabilitation's Motion for Summary Judgment* (Document 186), and the *Plaintiff's Motion for Summary Judgment Against the West Virginia Division of Corrections and Rehabilitation* (Document 188) be **DENIED**.

The Court **ORDERS** that the *Motion to Seal Various Exhibits to Defendant Wexford Health Sources, Inc.'s Motion for Summary Judgment* (Document 180) (sealed), the *Motion to Seal Various Exhibits to Defendant West Virginia Division of Corrections and Rehabilitation's Motion for Summary Judgment* (Document 184) (sealed), the Plaintiff's *Motion to File Exhibits Under Seal and Temporary Seal* (Document 191) (sealed), Defendant WVDCR's *Motion to File Exhibits Under Seal* (Document 199) (sealed), and the Plaintiff's *Motion for Leave to File Exhibit Under Seal* (Document 203) (sealed) be **GRANTED in part and DENIED in part**.   The Court further **ORDERS** that the following docket entries be **MAINTAINED UNDER SEAL**: Documents 180-1 through 180-22 (Wexford's Exhibits 1, 2, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24); Documents 184-1 through 184-22 (DCR's Exhibits 1, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24); Documents 191-1 and 191-2

(Plaintiff's Exhibits 5 and 14); Documents 199-2 through 199-22 (DCR's Response Exhibits 5 and 7-26); Document 203-1 (Plaintiff's Resp. Exhibit 1), and Document 199-23. The Court **ORDERS** that the motions to seal be **DENIED** as to the following documents and that they be **FILED** on the public docket: Documents 180-23, 184-23, 191-3 through 191-6, and 199-1.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:        June 13, 2024

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA