**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

JOSEPH TAYLOR,

                Plaintiff,

v.                                CIVIL ACTION NO.   2:23-cv-00475

WEXFORD HEALTH SOURCES,
INCORPORATED, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Plaintiff's Motion to Exclude Certain Opinions of Dr. Grady Bazzel* (Document 220) and the *Defendants' Joint Response in Opposition to Exclude Certain Opinions of Dr. Grady Bazzel* (Document 226), as well as all attached exhibits.[1]

Dr. Grady J. Bazzel submitted an expert report in this matter dated February 13, 2024. (Bazzel Rep.) (Document 202-8.)   He indicates that his opinions are based on his "training, education, and experience, as well as a review of the medical records and other documents/information in this case." (*Id.* at 1.)   Dr. Bazzel is currently the Patient Safety Officer and Medical Director of Care Management for Wellpath, a company that provides correctional healthcare throughout the United States.   He has worked in corrections since 2005 and is licensed to practice medicine in multiple states.   In his current role, he investigates patient deaths and other care errors and helps improve quality of care across Wellpath-managed sites.   He has familiarity

---

[1] For ease of reference, the Court has cited to the deposition and report submitted with the dispositive motions briefing.

with the Bureau of Prisons (BOP) Clinical Guidelines for the Diagnosis, Evaluation, and Treatment of Opioid Use Disorder (OUD), although he did not review them specifically while compiling his report.  (Bazzel Dep. at 74-75) (Document 195-7.)  Dr. Bazzel has some experience treating patients going through withdrawal, but limited experience prescribing Medications for Opioid Use Disorder (MOUD).  He obtained a DEA X-waiver, which was then necessary to prescribe buprenorphine, in 2011, but did not use it and did not retain it after 2013.  (*Id.* at 48-49.)  He again obtained the X-waiver in 2020 and prescribed buprenorphine to continue the medication for some patients who entered custody with active prescriptions, although he has never conducted a screening for OUD.  (*Id.* at 47-57.)  He has not prescribed MOUD since 2020, and he has never induced a patient onto buprenorphine.  (*Id.* at 220-221.)

In his report, Dr. Bazzel outlines Mr. Taylor's medical records from his incarceration at Central Regional Jail (CRJ) beginning on January 1, 2023.  The report notes that Mr. Taylor reported his use of Suboxone to treat OUD to intake staff, and that his urine drug screen on intake was positive for methamphetamine, amphetamine, and fentanyl, and negative for buprenorphine. It notes that he was prescribed various medications to treat withdrawal symptoms and opines that his COWS scores "reflected either no or mild withdrawal," with two COWS scores showing moderate withdrawal.  (Bazzel Rep. at 3.) The report recounts that "Mr. Taylor actively refused to participate in this process on at least one occasion on the following days: January 2, 6, 7, 8, and 11, 2023."  (*Id.* at 4.)  Dr. Bazzel explains that there are risks to the use of MOUD in correctional settings that are not present in the outside world, including the risk that other inmates will target a patient to obtain the medication.

Dr. Bazzel states that "[p]roper patient selection is the key to a successful Medication Assisted Treatment (MAT) program." (*Id.*) He states that the "psychological triggers for relapse are less present and the access to substances of abuse is greatly diminished," during incarceration, reducing the need for treatment. (*Id.*) Dr. Bazzel suggests that gaps in Mr. Taylor's treatment record, both before and after his period of incarceration, show a "pattern of spotty follow-up for this medication that he claims to need so badly," and that combined with reduced triggers for craving/relapse and decreased access to opioids in jail, supports having "him undergo a medically supervised withdrawal and see[ing] what degree of severity his OUD is under monitored circumstances." (*Id.* at 5.) Dr. Bazzel opines that urine drug screens "should play into medical decision making in this type of situation," and notes that Mr. Taylor had periods in which he submitted drug tests that were negative for all substances, indicating that he "was able to abstain from the use of opioids…without buprenorphine or he used opioids during a timeframe where they would not show up on the urine drug screen." (*Id.*) He also notes a post-incarceration drug screen that was positive for buprenorphine and fentanyl, which he suggests demonstrates that the buprenorphine was ineffective. (*Id.*)

Dr. Bazzel states that he has "treated literally thousands of patients" with medically supervised withdrawal from opioids "with no negative outcomes." (*Id.*) He offers the opinion that Mr. Taylor was not a good candidate for MAT while incarcerated because of his lack of compliance with COWS assessments, his urine drug screen results, and his gaps in treatment before and after his incarceration. He further opines that "the medical staff at CRJ were under no obligation to continue [buprenorphine] until such time that it became clear that it was needed. This need never presented itself," as demonstrated by "the fact that his first drug screen post-

incarceration was negative for illicit drugs." (*Id.* at 6.) He indicates that his disagreement with the opinions expressed by the Plaintiff's expert is based on the fact that Mr. Taylor did not present as "an established patient who had been compliant for an extended period of time with his treatment with buprenorphine." (*Id.*) He disputes the Plaintiff's allegations that Wexford has a policy or practice of denying MOUD. Finally, he states that he "will testify that the defendants met the standard of care in their treatment of Mr. Taylor," that he sees "no evidence of medical malpractice, deliberate indifference, discrimination (due to his OUD or any other reason), or negligence by any of the defendants," and that "[n]o errors of omission or commission on the part of the defendants led to any harm (lasting or otherwise) to this patient." (*Id.*)

## ARGUMENT

The Plaintiff argues that the opinions in Dr. Bazzel's report are contradicted by both the record and his own deposition testimony in several respects, including with regard to the existence of a policy or practice of forced withdrawal for OUD patients without an active MOUD prescription. He argues that Dr. Bazzel lacks experience and specialized training related to OUD, MOUD, and opioid withdrawal, and admitted that his opinions were not supported by published medical or scientific reports. The Plaintiff notes that Dr. Bazzel has "never conducted an OUD screening or a Rapid Opioid Dependence Screen and is not sure if he has ever reviewed such a test." (Pl.'s Mot. at 8.) The Plaintiff further contends that Dr. Bazzel's opinions are contradicted in key areas by the BOP Guidelines, a resource that he stated he was familiar with and considered authoritative. He urges the Court to exclude Dr. Bazzel as an expert entirely.

Absent full exclusion, the Plaintiff argues that several specific opinions offered by Dr. Bazzel are improper. He argues that Dr. Bazzel should not be permitted to offer opinions on the

legal issues of medical malpractice, deliberate indifference, discrimination, and negligence. In addition, he contends that Dr. Bazzel's opinion on the reduction in psychological triggers in jails and prisons should be excluded because it lacks any scientific support, and he is not a psychiatrist or psychologist with any qualification to offer such testimony. The Plaintiff next argues that Dr. Bazzel's testimony and conclusions related to incidents of alleged diversion and urine screen results, all occurring after the Plaintiff's January – March 2023 detention, should be excluded because medical staff could not have considered future events when determining Mr. Taylor's medical treatment at the time. He further argues that Dr. Bazzel's opinions regarding security concerns in a correctional setting related to MOUD are "pure conjecture by Dr. Bazzel who admitted in his deposition that he 'has no experience in correctional security,'" and cited no scientific or medical sources. (*Id.* at 18.) Finally, he argues that Dr. Bazzel's testimony opining about Mr. Taylor's credibility should be excluded.

The Defendants[2] argue that Dr. Bazzel's credentials are sufficient to qualify him to testify as an expert regarding the "standard of care of medical care in a correctional setting, including the treatment of Opioid Use Disorder." (Defs.' Resp. at 5.) They note that, although Dr. Bazzel does not perform as much direct patient care as he used to, he remains "well versed in what is required of patient care in all aspects of correctional medicine" through his role providing "essentially quality management," and emphasize that he prescribed buprenorphine in a jail "up until

---

2 The Defendants first seek to correct a "misstatement" wherein the Plaintiff contended that Wexford medical staff did not conduct any individualized medical evaluation or determination as to whether to provide Mr. Taylor with MOUD. The parties disagree as to the proper conclusions to be drawn from the medical records and other evidence in this case. The medical records show that Mr. Taylor was seen for an initial assessment and provided treatment and assessments during his withdrawal. Nothing in the records shows any provider explicitly evaluating Mr. Taylor for MOUD or giving a medically based explanation for declining to prescribe it. It is not a misrepresentation for the parties to argue reasonable interpretations of mixed and disputed evidence.

approximately 2020." (*Id.* at 6.)  They cite his testimony that he is "pretty familiar with" the BOP Guidelines on OUD, and assert that as an M.D., he has the medical qualifications, training, and experience necessary to treat OUD, and that he has past experience treating OUD.  (*Id.* at 7.) They argue that weighing the relative expertise of opposing experts is a jury function.  The Defendants contend that Dr. Bazzel's opinions were based on his review of many documents in the record in this case, and he testified as to his familiarity with and reliance on the BOP Guidelines.  They further argue that cross examination is the appropriate way to explore any inconsistencies between Dr. Bazzel's report and the BOP Guidelines, not exclusion.  They maintain that Dr. Bazzel "used his education, training, experience as an expert in correctional medicine, as well as application of the BOP Guidelines…, the Wexford Guidelines…, and in conjunction with information he gleaned from medical records and depositions to reach his conclusions."  (*Id.* at 13.)

As to the argument that Dr. Bazzel's legal opinions should be excluded, they contend that "because Dr. Bazzel is qualified as to the standard of care and deviations as to the standard of care, he is qualified to reach the conclusion that the medical care providers were not negligent, did not commit malpractice, and were not deliberately indifferent."  (*Id.* at 14.)  They further contend that his testimony as to psychological triggers is supported by his experience working in correctional medicine and based on sound reasoning.  The Defendants concede that testimony as to the Plaintiff's alleged MOUD diversion and post-release urine drug screens should be excluded unless the Plaintiff opens the door but argue that Dr. Bazzel should be permitted to testify about the Plaintiff's urine drug screen upon intake.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Supreme Court explained that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," emphasizing that the standard is flexible.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  The Supreme Court further explained that the Rule 702 standard is permissive, given that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.* at 596.  The Fourth Circuit has urged courts to "be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence."  *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).  However, "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded."  *Id.*

The first requirement, that the expert testimony be helpful to the trier of fact, is the Rule's "touchstone."  *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993).  To be helpful, the testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Daubert*, 509 U.S. at 591.  Testimony that is "within the common knowledge of the jurors" should be excluded, as it "almost by definition, can be of no assistance to a jury."  *United*

*States v. Harris*, 995 F.2d 532, 534 (4th Cir. 1993). "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion." *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998) (citing *U.S. v. Vitek Supply Corp.*, 144 F.3d 476, 486 (7th Cir. 1998)).

The burden is on the proponent of the expert testimony to establish, by a preponderance of the evidence, that the expert testimony satisfies Rule 702. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592). A court "abandon[s] its gatekeeping function" when it permits a jury to consider the weight of testimony without first addressing its reliability. *Nease v. Ford Motor Co.*, 848 F.3d 219, 230-31 (4th Cir. 2017). Though no single factor is dispositive, courts, as gatekeepers, must evaluate "whether a given theory has been tested," whether it is supported by literature in the field, whether it is has been subjected to peer review and publications, and the extent to which it "has been accepted within the relevant scientific or engineering community." *Id.* at 231-32.

## DISCUSSION

The Court assumes for purposes of this motion that Dr. Bazzel could be qualified as an expert at least as to some matters at issue in this case by his knowledge, skill, experience, training, or education, pursuant to Rule 702. The Court must next determine whether the proffered testimony and opinions are reliable and based upon sufficient facts or data. Dr. Bazzel's report does not contain citations or references to medical or scientific sources, so the Court looks to his deposition to gain an understanding of how he formed his conclusions.[3]

---

3 The parties fully explored the basis of Dr. Bazzel's opinions during his deposition. Therefore, the Court finds that a hearing is unnecessary.

Dr. Bazzel testified that he was "fairly familiar with" the BOP Guidelines but did not review them for purposes of this case until he was preparing for his deposition, after he had completed the report. (Bazzel Dep. at 74:24) (Document 195-7.) When asked what relevant medical literature he relied on in formulating his opinions, he replied, "None." (*Id.* at 78:6.) He opined that a patient's urine screen should be positive for buprenorphine for about a week if they are taking it consistently, negating any need to test for norbuprenorphine, and indicated that that opinion was derived from his "working knowledge of the subject" and that he was "sure [he] could find something that supports that," but could not name any sources. (*Id.* at 114::18-22.) He stated that he did not review any scientific literature or journal articles related to COWS scores. As to his opinion that some patients who would be appropriate candidates for treatment with MOUD in the community are not good candidates in a correctional setting, he stated that he did not know if any literature or reports existed to support that viewpoint. (*Id.* at 135.) He did not review any medical or scientific literature to formulate his opinion that there are fewer triggers for opioid cravings or relapse in jail, stating, "I'm sure I could find some. But it's just commonsensical." (*Id.* at 143::23-24.) He had no sources related to the prevalence of MOUD patients missing prescriptions or office visits. His testimony suggesting that Mr. Taylor's withdrawal symptoms may have been impacted by his methamphetamine use was also based on "common sense" rather than any medical or scientific sources. (*Id.* at 154:17.) When asked whether there was any scientific literature to support his position that a history of spotty compliance with filling MOUD prescriptions could support a decision not to prescribe, he replied, "Not that I know of." (*Id.* at 160:22.) Likewise, he did not review any report or scientific article

or guideline for the proposition that a patient who refused COWS assessments would be a poor candidate for MOUD.  (*Id.* at 174.)

The Court would exclude legal conclusions, such as the opinion that there is no evidence of medical malpractice, deliberate indifference, discrimination, or negligence, from any expert testimony.  A medical expert typically may testify as to the applicable standard of care and whether it was met in a given case.  *See e.g., Creekmore v. Maryview Hosp.*, 662 F.3d 686, 692 (4th Cir. 2011).  However, Dr. Bazzel's opinion that the Defendants met the standard of care in their treatment of Mr. Taylor was formed based on the analysis of Mr. Taylor's treatment as discussed above, none of which was based on facts, data, or reliable principles or methods.  "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods."  *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (quoting *Oglesby v. General Motors Corp.,* 190 F.3d 244, 250 (4th Cir.1999)).  "In this case, [the proposed expert] asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method."  *Id.*  Therefore, the Court finds that the Plaintiff's motion to exclude Dr. Bazzel from providing expert testimony should be granted.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Plaintiff's Motion to Exclude Certain Opinions of Dr. Grady Bazzel* (Document 220) be **GRANTED** and that Dr. Bazzel be **EXCLUDED** from testifying in this matter.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:        June 17, 2024

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

11